# EXHIBIT A

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (the "**Agreement**") is made and entered into by and between **Lodgeco Properties, Ltd.**, a Texas limited partnership ("**Lodgeco**"), **CHSC, Ltd.**, a Texas limited partnership ("**CHSC**"), and **Rossco Holdings Incorporated**, a California corporation ("**Rossco**"), as their interest may appear (Lodgeco, CHSC and Rossco shall be referred to herein collectively as "**Seller**"), and **PMH ACQUISITION, LLC**, a Georgia limited liability company and/or its successor or assigns ("**Purchaser**").

1.      **PURCHASE AND SALE.** Subject to the terms and conditions of this Agreement, and for and in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration to it in hand paid, the receipt and sufficiency of which are hereby acknowledged, Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller all of the following (collectively, the "**Property**"):

That certain real property consisting in approximately 7.7 gross acres of land located in the City of College Station, Brazos County, Texas, as more particularly shown as cross-hatched and outlined on **Exhibit "A"** attached hereto and made a part hereof, including all right, title and interest of Seller, if any, in and to all appurtenant streets, alleys, waterways, rights-of-way, buildings, improvements, and structures, any strips or gores between the Property, including all water and mineral rights, and all plants, shrubbery, trees, timber and all tenements, hereditaments, easements, access rights, and parking rights benefitting the Property.

2.      **PURCHASE PRICE.** Subject to credits, adjustments and prorations for which provisions are hereinafter made in this Agreement, the total purchase price to be paid by Purchaser for the Property, and received and accepted by Seller, is NINE MILLION SEVEN HUNDRED AND FIFTY THOUSAND AND 00/100 DOLLARS ($9,750,000.00) ("**Purchase Price**") based on an expected Bed Count (as defined in Section 8(d)) of six hundred (572) bedrooms for the Project (as defined in Section 8(d)). If as a result of Purchaser's efforts related to Final Development Approvals, Purchaser receives a building permit for more or less than a Bed Count of 572, then the Purchase Price shall be decreased or increased at the rate of SEVENTEEN THOUSAND AND FORTY-FIVE AND NO/100 Dollars ($17,045.00) per bed. The Purchase Price shall be payable at Closing by wire transfer of immediately available funds to an account designated by the Escrow Agent and the closing funds shall be disbursed as is customary for commercial real estate transactions.

3.      **EARNEST MONEY.** Within five (5) business days of the execution of this Agreement by Seller and Purchaser and Escrow Agent's signature hereto, the sum of FIFTY THOUSAND AND NO/100 DOLLARS ($50,000.00) shall be deposited by Purchaser as an earnest money deposit hereunder (the "**Earnest Money**"), which Earnest Money shall be held by the National Business Unit of Fidelity Title Insurance Company located in Atlanta, Georgia ("**Escrow Agent**") (provided however, Escrow Agent shall designate the Earnest Money be held at the National Business Unit located in Dallas, Texas) in escrow and shall be held subject to disbursement in accordance with the terms and provisions of this Agreement and the terms and conditions of escrow set forth on **Exhibit "B"** attached hereto and incorporated herein. The Earnest Money shall be held in interest bearing bank accounts, which have Federal Deposit Insurance coverage, and interest earned thereon shall also be part of the Earnest Money and shall be reported under Purchaser's U.S. Taxpayer Identification Number. Except as otherwise provided elsewhere in this Agreement, the Earnest Money and any interest earned thereon shall be

credited to and considered as payment of part of the total Purchase Price for the Property at the time of the Closing.

4. **COVENANTS, REPRESENTATIONS AND WARRANTIES OF SELLER**. Seller hereby covenants, represents and warrants to Purchaser that the following facts are, as of the date hereof, and will be, as of the date of Closing, true and correct:

(a) To Seller's knowledge, there are no violations of any governmental laws, ordinances, rules, regulations or orders relating to pollution, safety, health, building, fire or zoning in connection with the Property.

(b) There are no arrangements or contractual obligations or assessments of any kind, including service or operating contracts or commitments to any third party or governmental agency that would affect or impose any obligation on the Purchaser or the Property subsequent to the Closing Date.

(c) Seller is the owner of fee simple title to the Property and has full right, power and authority to execute, deliver and carry out the terms and conditions of this Agreement and all other documents to be executed and delivered by Seller pursuant to or in connection with this Agreement. All requisite resolutions, corporation or partnership, and any other consents, necessary for the consummation by Seller of the transaction herein described, have been or will before Closing be duly adopted and obtained.

(d) No person or entity has any right of first refusal or option to acquire the Property. There are no parties in possession or with any possessory rights, including licenses, in respect to the Property.

(e) Except as set forth on Schedule 4(e) attached hereto and made a part hereof, there is no action or proceeding pending against Seller, or, to Seller's knowledge, any part of the Property, which, if determined adversely as to the Seller, Purchaser or the Property, would have a material adverse effect on the Property, and to the best of Seller's knowledge and belief, no such action is contemplated or threatened by any party.

(f) The Property has full and free access to and from public streets or roads.

(g) Seller has not received any written notice of and has no knowledge of the issuance of any notice in respect to a requirement by any agency of any governmental agency or by any other person or entity that the Property requires any actions, including cleanup or removal regarding any hazardous waste, hazardous material or any other substance regulated by any state or Federal environmental laws. To the best knowledge and belief of Seller, the issuance of such a notice is not threatened or contemplated by any such agency or other person or entity. To Seller's knowledge, there are no buried materials on the Property and the Property has not been used for the purposes of storing, manufacturing or dumping and does not contain any hazardous waste or hazardous substances as defined in Federal Comprehensive Environmental Response Compensation and Liability Act of 1980 as amended or any other environmental protection laws.

(h) Other than on-site or off-site City of College Station development requirements or restrictions imposed upon the Property in connection with Final

Development Approvals, to Seller's knowledge, there is no existing, proposed or contemplated plan to widen, modify or realign any street or highway adjoining the Property which would affect access thereto, or any existing proposed or contemplated eminent domain proceeding that would affect the Property in any way whatsoever.

(i) Seller has no knowledge of any non-monetary restrictions or encumbrances affecting the Property which would hinder or preclude the development of the Property as a multi-family residential project.

5. **ADDITIONAL DOCUMENTS AND INFORMATION**. Within ten (10) business days after the date of this Agreement, Seller shall deliver to Purchaser the following documents and items (the "**Additional Documents and Information**") to the extent in Seller's possession:

(a) Copies of all surveys (including any existing survey), site plans, title reports, title insurance policies, including copies of exceptions in the title policies, environmental reports or studies, wetlands studies, engineering or similar types of reports, and architectural and engineering drawings relating to the Property, as well as copies of all information in Seller's possession addressing survey, soil, geological or environmental condition of the Property.

(b) Copies of all contracts, permits, pleadings, documents or other agreements in Seller's possession affecting or otherwise related to the Property; copies of all real estate tax bills for the years 2008, 2009 and 2010, if available; and evidence of any development entitlements and approvals applicable to the Property from the appropriate governmental authorities. Upon request of Purchaser, Seller shall provide Purchaser with reasonable access to any pleadings related to the litigation listed on Schedule 4(e).

6. **SELLER'S OBLIGATIONS**. Between the date hereof and Closing, Seller shall have the following obligations:

(a) Seller shall cooperate, at no out of pocket monetary cost to Seller, with Purchaser in obtaining any consents or other similar approvals necessary or appropriate to allow Purchaser to consummate this transaction including executing any documents or providing information that may be necessary or required in connection with Final Development Approvals (as defined below).

(b) Seller agrees to and shall execute all documents and undertake all reasonable actions, at no out of pocket monetary cost to Seller, in connection with any permitting or authorizations related to Property as may be necessary or appropriate in connection with Final Development Approvals, including appearing at any public meetings, if necessary, or hearings in relation thereto. Seller specifically acknowledges that local governmental authorities may require certain documents or applications related to Purchaser's development of the Property be submitted in Seller's name and Seller hereby concurs and agrees to reasonably cooperate by signing and submitting such documents as required.

(c) Seller shall cooperate with Purchaser as set forth in Section 18.

(d) The Seller and Purchaser acknowledge that this Agreement and the sale of the Property are subject to the approval of the United States Bankruptcy Court, Western

3

Division of Texas, Waco Division (the **"Bankruptcy Court"**) in Case No. 10-60953 pending in the Bankruptcy Court. The Seller and Purchaser acknowledge that to obtain such approval, the Seller must file a motion to approve the sale (the *"Sale Motion"*) and demonstrate that it has taken reasonable steps to obtain the highest and best offer possible for the Property, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court, and conducting an auction (the "*Auction*"). Seller shall obtain an order from the Bankruptcy Court which (i) authorizes the sale of the Property free and clear of liens, claims and encumbrances pursuant to Section 363(f), (ii) is satisfactory to Purchaser in all respects, (iii) authorizes Seller to sell the Property to Purchaser; (v) approves the sale and purchase of the Property upon the terms and subject to the conditions of this Agreement; (vi) finds that Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Code; (vii) finds that this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (viii) provides that this Agreement and the transactions contemplated hereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, Seller or any chapter 7 or chapter 11 trustee of Seller; and (ix) denies or otherwise resolves any objections to the proposed transaction in a manner reasonably acceptable to Seller and Purchaser (collectively the orders of Bankruptcy Court referenced in clauses (i) – (ix) of this paragraph inclusive are referred to as the *"Sale Order"*). Following the expiration of all appeals of such Sale Order (or expiration of the time for filing any such appeals if such appeal is not filed) without modification of such Sale Order and without the entry of a stay of consummation of the sale and purchase transaction as set forth in this Agreement, the Sale Order shall become the *"Final Order"*. In the event any appeal or other contest is taken by any party to the Sale Order, Seller shall use reasonable efforts to resolve such appeal or other contest in favor of this Agreement. In the event the Sale Order does not become a Final Order within 15 calendar days after entry of the Order by the Bankruptcy Court, Purchaser shall have the right to terminate this Agreement and, upon such termination, the Earnest Money Deposit and any interest earned thereon shall be refunded to Purchaser without any further action, consent or release by Seller.

7. **CONDITIONS PRECEDENT TO PURCHASER'S PERFORMANCE**. Purchaser shall not be obligated to perform under this Agreement unless each of the following conditions shall have been fulfilled at Closing:

(a)     Seller shall have timely performed its obligations under this Agreement in all material respects.

(b)     As of the Closing Date, Seller's representations and warranties shall be true, correct and complete in all material respects.

(c)     Purchaser has obtained Final Development Approvals.

(d)     Seller has satisfied each of Seller's Obligations (as defined in Section 18).

(e)     Seller shall have obtained the Final Order.

4

8.    **DUE DILIGENCE**.

(a)    <u>Examination of the Property</u>. Purchaser shall have the privilege, during the existence of this Agreement, of going upon the Property to inspect, examine, survey and make engineering, environmental, or landscaping tests or such other studies or surveys which it may deem necessary in its sole discretion regarding the Property and the development thereof.    Should anyone attempt to file a lien against the Property by reason of the Purchaser's activities, the Purchaser shall have the same canceled and discharged of record within thirty (30) days after Purchaser receives notice thereof.  In the event Purchaser shall fail or refuse to cancel or discharge such lien, Seller may do so at Purchaser's cost and expense.  Purchaser hereby indemnifies and agrees to hold Seller harmless from and against any and all liens, liabilities, claims, actions, damages, costs, and expenses and against any and all claims for death or injury to persons or damage to properties arising out of or as a result of Purchaser's or its agents or contractors or other representatives or their employees going upon the Property pursuant to the provisions of this Paragraph or otherwise.  This obligation to indemnify and hold Seller harmless shall survive the Closing and any termination of this Agreement.  Purchaser shall promptly restore the Property to its condition on the date hereof to the extent practicable after all such tests or surveys, with Purchaser's obligation so to restore to survive any termination of this Agreement. Purchaser shall also be permitted to examine all records, real estate tax assessment information and all other information pertaining to the Property which is in the possession or control of Seller.

(b)    <u>Inspection Period</u>. In the event Purchaser is not satisfied with the results of the foregoing inspection and examination on or before NINETY (90) days from the Effective Date of this Agreement (said period hereinafter referred to as the "**Inspection Period**"), Purchaser may notify Seller that it elects to terminate this Agreement, for any or no reason, at which time neither Seller nor Purchaser shall have any further obligations under this Agreement, and Escrow Agent shall immediately return the Earnest Money to Purchaser without any further action, consent, or release by Seller.

(c)    <u>Financing Contingency</u>. Purchaser shall have obtained financing (the "**Financing**") for the acquisition and development of Purchaser's proposed project to be constructed as contemplated by the Final Development Approvals on such terms and conditions as Purchaser may reasonably approve, provided such financing is consistent with terms customarily available from institutional lenders for similar types of projects.  Purchaser agrees to diligently pursue the Financing and, upon request, to advise Seller of the status thereof. In the event that Purchaser is unable to obtain the Financing on or before ONE HUNDRED AND TWENTY (120) days following the date hereof, Purchaser may (1) terminate this Agreement and receive a full refund of the Earnest Money, or (2) waive this condition precedent and proceed to Closing. In the event that Purchaser has not terminated this Agreement based upon a failure by Purchaser to obtain the Financing on or before 125 days following the date hereof, Purchaser will be deemed to have waived this contingency to Closing.

(d)    <u>Final Development Approvals</u>. Purchaser shall have obtained Final Development Approvals (as hereinafter defined) of the Property in a manner which will result in the Property being zoned to a zoning classification of Purchaser's choosing which allows Purchaser to develop and construct apartment style housing of not less than 370 dwelling units and 600 bedrooms (the "**Project**").  "**Final Development Approvals**" as used herein

means: (i) that all legal requirements for rezoning, replatting, site plan approval (including a Bed Count of 572), and all permitting have been completed; (ii) that the appropriate governmental authorities have taken all necessary actions for such rezoning, replatting, site plan, and permitting; (iii) that all periods within which appeal, suit or other challenge to the rezoning, replatting, site plan, or permitting of the Property could be asserted have expired without any such appeal, suit or challenge having been made, and in the event that a challenge or appeal has been made, such appeal or challenge shall have been finally resolved in the Purchaser's favor; and (iv) Purchaser shall have obtained all administrative and regulatory approvals, permits and consents to construct the improvements on the Property as approved, including without limitation any grading or building permits. Purchaser agrees to diligently and in good faith pursue Final Development Approvals of the Property in accordance with this Agreement. In the event that Purchaser is unable to obtain Final Development Approvals on or before ONE HUNDRED AND EIGHTY (180) days following the date hereof, Purchaser may (1) terminate this Agreement and receive a full refund of the Earnest Money, or (2) waive this condition precedent and proceed to Closing. The later of (i) the date on which Purchaser obtains Final Development Approvals, or (ii) 185 days following the date hereof, shall be deemed the "**Development Approvals Date**." The defined term "**Bed Count**" shall refer to the actual number of bedrooms finally approved by city, county, and other local authorities for the Project as determined by written correspondence confirming Purchaser's right to obtain a building permit to construct such number of bedrooms as part of the Project. Notwithstanding anything herein to the contrary, in the event that Purchaser elects to proceed with the Closing with a Bed Count of 500 or less, and Seller has been provided with written confirmation from city, county or other local authorities, indicating Purchaser's right to obtain a building permit to construct not more than 500 bedrooms, then Seller shall have the option to terminate this Agreement, provided however, all Earnest Money shall be refunded to Purchaser. Seller and Purchaser agree to amend this Agreement (the "**Price Amendment**") in accordance with the terms of this Section 8(d) and Section 2, on or before 30 days following Purchaser's receipt of written confirmation of the Bed Count in order to confirm the Purchase Price.

(e)     Intentionally Omitted.

(f)     Termination. In the event that Purchaser elects to terminate this Agreement pursuant to this Section 8, Purchaser shall pay Seller the sum of $100.00 as consideration for such termination right and be entitled to a prompt refund of the Earnest Money, whereupon this Agreement shall terminate and be of no further force and effect, except for the indemnification obligation set forth in Section 8(a) above.

(g)     Utility Availability. Notwithstanding anything contained herein to the contrary, if at or prior to Closing, any utility company or governmental entity takes any action, including any moratorium, that results in the non-availability (including the lack of sufficient pressures or capacities) to the Property at Closing of any utility necessary for the development thereof, then Purchaser may terminate this Agreement and be entitled to a prompt refund of the Earnest Money, whereupon this Agreement shall be of no further force and effect except for the indemnification obligation set forth in Section 8(a) above.

SGR\13977SGR\1397714.95.005

9.      **TITLE AND SURVEY**.

(a)      Title Commitment. Within thirty (30) days after the execution hereof, Purchaser shall obtain and provide to Seller an ALTA standard form of Commitment for Owner's Title Insurance listing Purchaser as the named insured (the "**Title Commitment**") issued by Fidelity Title Insurance Company ("**Title Insurer**"), setting forth the state of title to the Property and all exceptions, including easements, deed restrictions, other restrictions, rights-of-way, covenants, reservations, and other conditions, if any, affecting the Property which would appear in an Owner's Title Policy, if issued, and a certificate from the Title Insurer, indicating the amount, if any (or if none, so stating), of any real estate taxes attributable to the Property including, without limitation, taxes arising by virtue of any special use valuations affecting the Property.

(b)      Survey. On or before the expiration of the Inspection Period, Purchaser shall, at Purchaser's sole cost and expense, obtain and provide to Purchaser an accurate ALTA/ACSM Land Title Survey of the Property prepared by a surveyor registered under the laws of the State of Texas, which survey shall show (i) the number of acres contained in the Property, and (ii) the Gross Acreage, to the nearest one thousandth (1/1000th) of an acre (the "**Survey**"). The Survey shall contain a legally sufficient description of the metes and bounds of the Property. The legal description of the Property based upon the Survey shall (i) become a part of this Agreement without the necessity of any further action by either of the parties hereto, (ii) replace the description of the Property attached hereto as **Exhibit "A"**, and (iii) be used in the Deed. Purchaser shall pay all costs and expenses incurred in connection with the preparation of the Survey (whether in satisfaction of a Title Company requirement for the Owner Policy or a requirement of Purchaser's lender, if any, or otherwise).

(c)      Title Objections and Permitted Exceptions. In the event any exceptions appear in such Title Commitment or title documents or in the Survey that are reasonably unacceptable to Purchaser ("**Purchaser's Objections**"), then Purchaser shall notify Seller in writing of such fact on or before the expiration of the Inspection Period. Seller shall use its best efforts to eliminate or modify such unacceptable exceptions to the reasonable satisfaction of Purchaser. In addition, Seller shall be obligated to remove at or prior to Closing, all mortgages, deeds of trust or other liens or encumbrances which encumber the Property which can be cured or removed by the payment of money. Seller covenants and agrees that it shall not, without the prior written consent of Purchaser, permit any encumbrances to be filed against the Property following the execution hereof. Purchaser reserves the right to object, on or before the Closing Date, to any new matter shown in an updated title commitment, revised survey, updated title search, or any other new matter (hereinafter, "**New Matter**") of title not included in the Title Commitment or not shown on the Survey at the time Purchaser delivers Purchaser's Objections to Seller. In the event that such New Matter is not cured by Seller for any or no reason, Purchaser shall be entitled to terminate this Agreement and receive a full refund of the Earnest Money. Any exceptions to title to which Purchaser does not object on or before Closing and any matter objected to but not cured by Seller and which Purchaser elects to accept shall be deemed to be "**Permitted Exceptions**."

10.      **CLOSING**. The Closing shall take place at the offices of Title Insurer, or such other location as may be determined by Purchaser, on or before ninety (90) days following the later to occur of the date on which (i) the Inspection Period expires, or (ii) the Development Approvals Date, or (iii) Seller has fully satisfied Seller's Obligations (the "**Closing Date**"). To the extent possible, the parties agree to

7

cooperate to close the transaction by mail through the Title Insurer. Except to the extent reasonably necessary to extend Closing in order that Purchaser may obtain Purchaser's building permits to commence construction, the Closing shall occur on or before April 30, 2011.

(a)     At Closing, Seller shall deliver to Purchaser the following items, which items shall be in form and substance reasonably satisfactory to Purchaser:

(i)     A Special Warranty Deed in recordable form conveying good and marketable fee simple title to the Property, subject only to the Permitted Exceptions, reciting only nominal consideration and a quitclaim deed to the Property based upon the Survey.

(ii)     A standard non-foreign affidavit stating Seller is not a foreign entity.

(iii)     An owner's affidavit in the form required by the Title Insurer.

(iv)     Any other items or documents affecting the conveyance and sale of the Property which may be reasonably requested by the Purchaser or the Title Insurer to satisfy the Seller's requirements and the "standard exceptions" as set forth in the Title Commitment.

(b)     Purchaser shall deliver to Seller:

(i)     The Purchase Price provided for in Section 2 herein, subject to Section 18(c).

(ii)     Any other items or documents affecting the conveyance and sale of the Property which may be reasonably requested by Seller or the Title Insurer.

11.     **COSTS PAID AT CLOSING**. Seller shall pay the cost of Seller's counsel, the cost of an Owner's policy of title insurance in the amount of the Purchase Price (provided however, Purchaser shall be responsible to pay the cost of any title insurance endorsements or extended coverage), the cost of preparing the deed, transfer tax (if any), document taxes, all charges for the preparation and recordation of any releases or instruments required to clear Seller's title for conveyance in accordance with the provisions of this Agreement, and one-half (1/2) of any escrow fee charged by the Escrow Agent. Purchaser will pay the cost of Purchaser's counsel, the cost of any survey or survey update, recording fees, all charges for the recordation of the instruments conveying title to the Property, and one-half (1/2) of any escrow fee charged by the Escrow Agent. All other costs shall be paid according to the custom of the locality where the Property is located.

12.     **PRORATIONS**. All items of income and expense attributable to the Property, including all ad valorem taxes for the then current year, and other proratable items of income or expense shall be prorated at the Closing, effective as of 11:59 p.m. of the day of the Closing Date. Seller shall pay any taxes and subsequent assessments, if any, for prior years due to changes in land usage or ownership, including any rollback taxes. If the Closing Date occurs before the ad valorem tax rate is fixed for the then current year, the apportionment of taxes shall be on the basis of the tax rate for the preceding year

applied to the latest assessed valuation, such proration to be adjusted following Closing upon determination of the final tax amount (after appeal if appealed).

13. **CONDEMNATION**. If, prior to Closing, the Property or part thereof is subject to an eminent domain or condemnation proceeding, Seller, immediately upon learning thereof, shall give written notice to Purchaser. Thereafter, Purchaser shall have a period of thirty (30) days within which to elect, by written notice to Seller, to terminate the Agreement. In the event of such termination on or before Closing, all Earnest Money made pursuant to the Agreement shall be returned to Purchaser, and the Agreement shall become null and void. If no such election is timely made, Purchaser shall be deemed to have waived its rights under this paragraph, except that, if the transaction contemplated hereby closes, Purchaser shall be entitled to the proceeds or the right to negotiate, settle and collect the proceeds of such condemnation award, and Seller shall execute and deliver all documents reasonably requested of Seller in order to effectuate this section.

14. **RISK OF LOSS**. Seller assumes all risks and liability for loss, damage, destruction or injury by fire, storm, accident or any other casualty to the Property from all causes until the Closing has been consummated. In the event of any material damage or destruction prior to Closing, Purchaser shall have the option exercisable by written notice to Seller within thirty (30) days after Purchaser is notified of such casualty, to terminate this Agreement by notice thereof to Seller, in which case the parties shall have no further rights or obligations under the Agreement and, in the event of such termination on or before Closing, all Earnest Money shall be returned to Purchaser; or Purchaser may elect to close this transaction and, in such event Purchaser shall be entitled to receive the full amount of any proceeds of such insurance payable on account of loss, damage or destruction after the date hereof and Seller shall be liable for the payment to Purchaser of all deductibles under applicable insurance policies. Seller covenants to execute such assignments, drafts and other instruments as may be required to effectuate this section.

15. **APPLICATION OF EARNEST MONEY AND REMEDIES UPON DEFAULT**.

(a)     Earnest Money. Upon the Closing of the purchase and sale hereunder, the Earnest Money shall be applied to and credited toward the Purchase Price.

(b)     Seller Default. If the purchase and sale hereunder are not closed by reason of Seller's default hereunder, Purchaser shall  have all rights at law or in equity, including the right to (i) specific performance of this Agreement or (ii) terminate this Agreement and receive a refund of the Earnest Money.

(c)     Purchaser Default. If the purchase and sale hereunder are not closed by reason of Purchaser's material default hereunder, then, as full liquidated damages for such default by Purchaser, the Earnest Money shall be immediately paid to Seller. It is specifically understood and agreed that payment of the Earnest Money to Seller, as liquidated damages, shall be Seller's sole and exclusive remedy hereunder, and Seller is hereby specifically waiving and relinquishing any and all other remedies at law or in equity. The parties acknowledge that the actual amount of the damages which Seller would sustain as a result of Purchaser's breach of this Agreement are difficult or impossible to estimate and that the payment of Earnest Money to Seller represents the parties' best estimate of Seller's damages in the event of such breach and is not to be construed as a penalty or forfeiture. The said stipulated sum is a reasonable pre-estimate of the probable loss resulting from such a breach.

16.     **BROKERAGE**. Seller and Purchaser each represent and warrant to the other that neither has employed, retained or consulted any broker, agent, consultant, or finder in carrying on the negotiations in connection with this Agreement or the purchase and sale referred to herein, and Seller and Purchaser shall each indemnify and hold the other harmless from and against any and all claims, demands, causes of action, debts, liabilities, judgments and damages (including costs and reasonable attorneys' fees incurred in connection with the enforcement of this indemnity) which may be asserted or recovered against the indemnitor's breach of this representation and warranty. The indemnity in this Paragraph shall survive the Closing or any termination of this Agreement.

17.     **MISCELLANEOUS**.

    (a)     _Assignment_. Purchaser shall obtain Seller's consent, which such consent shall not be unreasonably withheld, prior to assigning Purchaser's rights in this Agreement; provided, however, Purchaser may assign Purchaser's rights in this Agreement to an affiliated entity of Purchaser without the consent of Seller.

    (b)     _Notices_. Any notice, consent, approval, waiver, and election which any party shall be required or permitted to make or give under this contract shall be in writing and shall be deemed to have been sufficiently made or given if delivered by hand, courier, telecopier, certified mail, or overnight delivery service (such as Federal Express or United Parcel Service), addressed to the respective parties at the addresses below:

    TO SELLER:       Leonard M. Ross
                     1011 N. Beverly Drive
                     Beverly Hills, California 90210
                     Phone: 310-271-9660
                     Fax: 310-271-9662

                     Lodgeco Properties, Ltd.
                     1011½ North Beverly Drive
                     Beverly Hills, CA 90210
                     Phone: 310-271-9660
                     Fax: 310-271-9662

                     CHSC, Ltd.
                     1011½ North Beverly Drive
                     Beverly Hills, CA 90210
                     Phone: 310-271-9660
                     Fax: 310-271-9662

                     Rossco Holdings Incorporated
                     Administrative Branch Office
                     1011½ North Beverly Drive
                     Beverly Hills, CA 90210
                     Phone: 310-271-9660
                     Fax: 310-271-9662

SGR\13977SGR\1397714.95.005

WITH A COPY TO:     David Giles
                    10440 North Central Expressway
                    Suite 1030
                    Dallas, Texas 75231
                    Phone: (214) 696-8802 Direct
                    Fax: 214-242-3816 (Fax)




TO PURCHASER:       PMH Acquisition, LLC
                    Two Live Oak Center
                    3445 Peachtree Rd. NE
                    Suite 1400
                    Atlanta, Georgia 30326
                    Attn: Cecil Phillips
                    Phone: 404/495-7521
                    Fax:  404/495-7523

                    PMH Acquisition, LLC
                    Two Live Oak Center
                    3445 Peachtree Rd. NE
                    Suite 1400
                    Atlanta, Georgia 30326
                    Attn: Mario Spinella
                    Phone: 404/495-7642
                    Fax:  404/495-7643

WITH A COPY TO:     Smith, Gambrell & Russell, LLP
                    Suite 3100, Promenade II
                    1230 Peachtree Street, N. E.
                    Atlanta, Georgia  30309
                    Attn:  Malcolm D. Young, Jr., Esq.
                    Phone: 404/815-3774
                    Fax:  404/685-7074


Such notices shall be deemed received upon delivery when delivered by hand, by courier or
by overnight delivery service.  Each notice given by telecopy shall be deemed given on the
date shown on the sender's copy thereof or confirmation notice showing date, time of
transmission and number of pages transmitted.  In the event that the telecopy transmission to
the above facsimile phone number fails for any reason, said notice shall be deemed given on
the date shown on the sender's copy thereof or confirmation notice showing date and time of
attempted transmission, so long as the sender makes reasonable efforts thereafter to deliver
such notice. Refusal to accept, or inability to deliver because of changed address of which no
notice was given, shall be deemed receipt on the date of such refusal of delivery or inability
to deliver.

Either party may, from time to time, change the address to which notices shall be sent by like notice given to the other party hereto, except that no party may change its address to other than a street address. Any notice given that does not conform to this paragraph shall be effective only upon receipt.

(c) <u>Entire Agreement</u>. This Agreement, with the exhibits attached hereto, constitutes the entire agreement between Seller and Purchaser, and there are no other covenants, agreements, promises, terms, provisions, conditions, undertakings, or understandings, either oral or written, between them concerning the Property other than those herein set forth. No subsequent alteration, amendment, change, deletion or addition to this Agreement shall be binding upon Seller or Purchaser unless in writing and signed by both Seller and Purchaser.

(d) <u>Headings</u>. The headings, captions, numbering system, etc., are inserted only as a matter of convenience and may not be considered at interpreting the provisions of the Agreement.

(e) <u>Binding Effect</u>. All of the provisions of this Agreement are hereby made binding upon the personal representatives, heirs, successors, and assigns of all parties hereto.

(f) <u>Time of Essence</u>. Time is of the essence of this Agreement.

(g) <u>Unenforceable or Inapplicable Provisions</u>. If any provision hereof is for any reason unenforceable or inapplicable, the other provisions hereof will remain in full force and effect in the same manner as if such unenforceable or inapplicable provision had never been contained herein.

(h) <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which will for all purposes be deemed to be an original, and all of which are identical.

(i) <u>Facsimile Signature</u>. A signature transmitted by facsimile transmission shall be effective between the parties.

(j) <u>Applicable Law, Place of Performance</u>. This Agreement shall be construed under and in accordance with the laws of the state in which the Property is located.

(k) <u>Purchaser's Waiver of Conditions Precedent</u>. Purchaser may, at Purchaser's sole option, elect to waive any of the conditions precedent to Purchaser's performance specified herein by giving written notice of such election to Seller at any time on or before the Closing Date.

(l) <u>Survival Clause</u>. The representations, warranties and covenants contained herein shall not merge in the deed or any other document and shall survive the Closing.

(m) <u>Construction</u>. The parties acknowledge that each party and its counsel have reviewed and approved this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or exhibits hereto.

(n)     Business Days.  If the final day of any period or any date of performance under this Agreement falls on a Saturday, Sunday or legal holiday, then the final day of the period or the date of performance shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

(o)     Telecopies. The parties hereto agree that documents transmitted by telecopy or facsimile transmission shall be deemed to be written instruments and shall be binding on the parties executing and delivering such documents.

(p)     Purchase Price Allocation. Allocation of the Purchase Price as part of the distribution of closing funds following the Closing by and among Lodgeco, CHSC and Rossco and shall be a matter with which Purchaser is not to be concerned.

(q)     Tax Free Exchange Program. Seller shall have the right to effect a tax free exchange under Section 1031 of the Internal Revenue Code and Purchaser shall cooperate with Seller with regard thereto; provided, however, that Purchaser shall not incur any additional costs, expense or liability pertaining thereto.  Seller shall have the right to assign this Agreement to an intermediary to effect an exchange. Purchaser shall have the right to reasonably comment upon any documents requiring Purchaser's signature.

18.     **OTHER DEVELOPMENT ISSUES**.

(a)     Signage. In the event that Purchaser has not terminated this Agreement, Purchaser shall have the right, at its sole cost and expense, to erect one prominently located sign on the Property no earlier than 120 days following the date of this Agreement, which sign shall announce the development of the Property proposed by Purchaser and the parties involved in connection with the proposed development.  Such signage shall be subject to the consent of the Property owner's association, which consent shall not be unreasonably withheld, conditioned or delayed, and shall comply with all applicable laws and regulations.

(b)     Seller's Obligations. As a material part of the consideration for Purchaser's purchase of the Property, Seller hereby agrees that on or before the Closing, Seller shall have the obligation of diligently pursuing the satisfaction of the following (each of the following items, collectively, "**Seller's Obligations**"):

(i)     Intentionally Omitted.

(ii)     Tenant Removal from the Property. Purchaser and Seller each acknowledge that there are currently tenants on the Property occupying certain improvements pursuant to residential leases (the "**Tenant Leases**"). Seller hereby represents that there are no written or verbal leases other than those Tenant Leases listed in the rent roll attached hereto as **Exhibit "C"** (the "**Rent Roll**"). All existing Tenant Leases are on the Lease Form attached hereto as **Exhibit "D"** (the "**Lease Form**"). The Rent Roll, together with the Lease Form, is correct, complete, and accurately reflects the terms of all existing leases, including the lease termination terms of all Tenant Leases executed prior to the date of this Agreement. All leases executed as of or after the date of this Agreement will be on the Lease Form (any such new lease, a "**New Lease**"). No New Lease, or any renewal of any existing Tenant Leases, shall require greater than 30 days

written notice to terminate. Notwithstanding anything herein to the contrary, Seller shall terminate all Tenant Leases on or before closing and Seller shall be responsible to deliver the Property free and clear of all Tenant Leases, tenants, or other occupants of the Property at Closing. Seller hereby agrees to indemnify Purchaser and to hold purchaser harmless from any and all costs, damages, liabilities, or expenses related to the Tenant Leases, which indemnification shall survive closing. In the event that Seller fails to deliver the Property free of such Tenant Leases or occupants, the Purchaser may either (i) waive this contingency, take an assignment of Seller's interest of any and all Tenant Leases, and proceed to Closing, (ii) terminate this Agreement and receive a full refund of the Earnest Money, or (iii) exercise any of Purchaser's other rights as set forth herein.

(c)     <u>Intentionally Omitted</u>.

(d)     <u>Joint Access Easement</u>. Purchaser and Seller (the "**Parties**") hereby agree that as a material part of this transaction, the Parties shall enter into a joint use access easement (the "**Joint Access Easement**"), in order that Purchaser may access the Property from University Drive over Meadowland Street, which street is currently owned by Seller, and that following the Closing, Seller may access adjacent property (the "**Adjacent Property**") currently owned by Seller by means of the Joint Access Easement as it crosses the Property. The Joint Access Easement shall include the following terms:

(i)     The Joint Access Easement shall give each of the Parties the non-exclusive right to use the cross-hatched area (the "**Joint Access Easement Area**") shown on the site plan (the "**Site Plan**") attached hereto as **Exhibit "E"** for pedestrian and vehicular access. Seller shall grant the easement to Purchaser for the portion of the Joint Access Easement Area marked "**Seller Owned Property**", and Purchaser shall grant the easement to Seller for the portion of the Joint Access Easement Area marked "**Purchaser Owned Property**." The Joint Access Easement Area shall be in the location shown on the Site Plan along Meadowland Street, and Seller shall not have any right to relocate or otherwise change the location of the Joint Access Easement Area.

(ii)     The Joint Access Easement shall include the right for each of Seller and Purchaser to install and maintain utilities within the Joint Access Easement Area to serve the Property and the Adjacent Property.

(iii)     The Joint Access Easement shall provide for reasonable construction and maintenance cost sharing between the Parties.

(iv)     The Joint Access Easement shall be affirmatively insured by Title Insurer, without exception, as an appurtenance to the Property (with respect to the Seller Owned Property) included as part of Purchaser's insured estate in the Title Commitment and the Parties shall each be obligated to obtain any necessary lien or lender subordinations in connection therewith.

(v)     The Joint Access Easement shall include the customary indemnities for such use.

(vi)     The parties agree to change the location of the Joint Access Easement Area as shown on **Exhibit "E"** in the event that Seller is able to provide to Purchaser

another acceptable location for such easement area satisfactory to Purchaser (in Purchaser's sole discretion) from the Property to University Drive.

(e)     Intentionally Omitted.

(f)     Site Plan and Elevations. Seller and Purchaser shall cooperate to design a mutually satisfactory site plan and elevations (the "**Project Design**") for the Project on or before 30 days following the date hereof. In the event that Seller and Purchaser fail to finalize the Project Design on or before the aforesaid 30 day period, then either of Seller or Purchaser shall deliver notice to the other indicated the specific objections to the proposed site plan and elevations, and Seller and Purchaser shall reasonably cooperate to address each of such objections on or before the expiration of the Inspection Period.

(g)     Place Properties parking structure shall be built and located closest to Hansel.

19.     **BANKRUPTCY COURT APPROVAL**. Purchaser hereby acknowledges that under Section 363 of the Code, Seller has a fiduciary responsibility to maximize the value of the Property and that, pursuant to such responsibility, Purchaser hereby expressly agrees that Seller may solicit and receive *bona fide* bids for the Property from qualified third parties pursuant to the overbid procedures agreed to by Purchaser and Seller and approved by the Bankruptcy Court (the "***Overbid Procedures***"). The Seller shall propose and request that the Bankruptcy Court approve the following as part of the Overbid Procedures, but no such procedures shall be binding on Seller unless authorized and approved by the Bankruptcy Court.

(a)     Breakup Fee. If this Agreement is terminated because the Bankruptcy Court has approved an overbid pursuant to the Overbid Procedures and the Seller closes a sale with the successful overbidder, then the Seller shall pay to Purchaser a fee in the amount of $292,250.00 (the "***Breakup Fee***"). The payment of the Breakup Fee shall be made by wire transfer of immediately available funds promptly (but in any event within two (2) business days) following the closing of the sale with the successful overbidder and to the extent not paid to the Purchaser, will be granted super priority administrative expense status in the Seller's bankruptcy case payable out of the Seller's cash or other collateral securing the Seller's obligations (and which shall be senior to any and all claims of any creditors or equity holders of the Seller, including prepetition and postpetition amounts owing to the Seller's prepetition and/or postpetition senior secured lenders). In the event the closing with the successful overbidder does not occur, the Seller may proceed to close with the next highest overbidder, including the Purchaser. If the Seller closes with any overbidder, the Purchaser shall be entitled to a Breakup Fee. Closing with the next highest overbidder shall occur under the terms and conditions of the Overbid Procedures.

(b)     Minimum Overbids. The initial overbid over the Purchase Price shall be in an amount that is greater than the Purchase Price by at least fifty thousand dollars ($50,000.00) plus the Breakup Fee. All subsequent overbids shall be at least $100,000.00 over the immediate previous best offer. Purchaser shall have the right to submit an overbid in response to any initial overbid or subsequent overbids. Purchaser may include an amount equal to the Breakup Fee as cash consideration for purposes of any overbids by Purchaser. In no event shall an Overbid be accepted until such time as Purchaser has had a reasonable opportunity to submit an additional bid.

SGR\13977SGR\1397714.95.005

(c)      <u>Qualified Bid Submission</u>. Qualified Bids should be submitted to Seller 3 days prior to the date of the Auction as provided in the Bid Procedures Order.

(d)      <u>Qualification to Overbid</u>. All parties intending to bid on the Property at the Auction must submit a "***Qualified Bid***", which shall mean a written proposal provided to the Seller and Purchaser for the purchase of the Property by a potential bidder provided in accordance with the Bidding Procedures and that satisfies all the requirements set forth in the Bidding Procedures, including, without limitation, that any such proposal (a) does not contain any financing or due diligence contingencies beyond those contemplated by this Agreement, (b) is accompanied by a marked copy of this Agreement, which shall be the agreement pursuant to which such prospective purchaser proposes to acquire the assets sought to be acquired (proposals may not be for less than substantially all assets); (c) is accompanied by evidence of committed financing or other ability to perform; (d) is accompanied by a good-faith deposit equal to the Earnest Money Deposit and payable to the Seller; (e) is timely submitted by the bid deadline set forth in the Bidding Procedures Order and (f) that is accompanied by a letter stating that the bidder's offer is irrevocable until the earlier of (i) two business days after the Closing date of an alternative sale or sales approved by the Bankruptcy Court and (ii) forty-five days after the conclusion of the Sale Hearing. This Agreement shall be deemed to be a Qualified Bid.

(e)      <u>Overbid Approval.</u> The Seller or the secured creditor may dispute any overbid.

(f)      <u>Bankruptcy Court Approval</u>.

(i)      Within five (5) business days after the date of this Agreement, the Seller shall file its motion to approve the bidding procedures described in this Section 19 with the Bankruptcy Court (the "***Bidding Procedures Motion***"), together with appropriate supporting papers and notices, seeking the entry, within twenty (20) days of the filing of such motion, of an order seeking approval of the bidding procedures (the "***Bidding Procedures Order***"). The Bidding Procedures Motion and Bidding Procedures Order shall be in form and substance reasonably acceptable to the Purchaser. Simultaneously with the filing of the Bidding Procedures Motion, the Seller shall file the Sale Motion with the Bankruptcy Court.

(ii)      The Seller shall use its commercially reasonable efforts to obtain entry of the Bidding Procedures Order no later than twenty (20) days after filing the Bidding Procedures Motion.

(iii)      The Bidding Procedures Order shall provide dates for bid deadline, the Auction and the hearing on the Sale Motion.

(iv)      In the event an appeal is taken or a stay pending appeal is requested, from either the Bidding Procedures Order or the Sale Order, the Seller shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser promptly a copy of the related notice of appeal or order of stay. The Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.

SGR\13977SGR\1397714.95.005

(v)     From and after the date of this Agreement and to the extent Purchaser is the successful bidder at the Auction, the Seller shall not take any action that is intended, or fail to take any action the intent of which failure to act would result in the reversal, voiding, modification or staying of the Bidding Procedures Order or the Sale Order.

[SIGNATURES BEGIN ON NEXT PAGE]

SGR\13977SGR\1397714.95.005

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the date this Agreement has been signed by both Purchaser or Seller. All references to the "date of this Agreement", the "Effective Date", or similar references shall mean the date on which the later of Seller or Purchaser shall have executed this Agreement. Escrow Agent's signature below shall not affect the Effective Date of this Agreement.

SELLER:

**LODGECO PROPERTIES, LTD.**
By Rossco Holdings Incorporated, General Partner

By _____
Leonard M. Ross, President

**CHSC, LTD.**
By Rossco Holdings Incorporated, General Partner

By _____
Leonard M. Ross, President

**ROSSCO HOLDINGS INCORPORATED**

By _____
Leonard M. Ross, President

9/29/2010
_____
Date of Final Execution

PURCHASER:

**PMH ACQUISITION, LLC**

By: _____
Cecil M. Phillips, Manager

October 5 2010
_____
Date of Final Execution

The undersigned agrees to hold and disburse the Earnest Money in accordance with this Agreement.

FIDELITY TITLE INSURANCE COMPANY


By: _____
Name: _____
Title: _____


Date: _____

**Exhibit "A"**

**LEGAL DESCRIPTION**



EXHIBIT "A"

SGR\13977SGR\1397714.95.005