FT000025345 01

THE FOLLOWING COMMITMENT FOR TITLE INSURANCE IS NOT VALID UNLESS YOUR NAME AND THE POLICY AMOUNT ARE SHOWN IN SCHEDULE A, AND OUR AUTHORIZED REPRESENTATIVE HAS COUNTERSIGNED BELOW.



**COMMITMENT FOR TITLE INSURANCE**
ISSUED BY

## FIDELITY NATIONAL TITLE INSURANCE COMPANY

We, FIDELITY NATIONAL TITLE INSURANCE COMPANY, a California corporation, will issue our title insurance policy or policies (the Policy) to You (the proposed insured) upon payment of the premium and other charges due, and compliance with the requirements in Schedule B and Schedule C. Our Policy will be in the form approved by the Texas Department of Insurance at the date of issuance, and will insure your interest in the land described in Schedule A. The estimated premium for our Policy and applicable endorsements is shown on Schedule D. There may be additional charges such as recording fees, and expedited delivery expenses.

This Commitment ends ninety (90) days from the effective date, unless the Policy is issued sooner, or failure to issue the Policy is our fault. Our liability and obligations to You are under the express terms of this Commitment and end when this Commitment expires.

Issued by:
FIDELITY NATIONAL TITLE AGENCY, INC.
260 Three Lincoln Center, 5430 LBJ FWY
Dallas, TX 75240
Phone: (972)770-2121   Fax: (972)770-2112

Fidelity National Title Agency, Inc.

_____
Authorized Signature

8/25/2010

*Fidelity National Title Insurance Company*

By: _____ President
ATTEST
_____ Secretary

FORM 1873
REPRINTED (01/00)

TEXAS FORM T-7: COMMITMENT FOR TITLE INSURANCE
Effective 1-1-93

EXHIBIT "A" CONTINUED

**CONDITIONS AND STIPULATIONS**

1. If you have actual knowledge of any matter which may affect the title or mortgage covered by this Commitment, that is not shown in Schedule B, you must notify us in writing. If you do not notify us in writing, our liability to you is ended or reduced to the extent that your failure to notify us affects our liability. If you do notify us, or we learn of such matter, we may amend Schedule B, but we will not be relieved of liability already incurred.

2. Our liability is only to you, and others who are included in the definition of Insured in the Policy to be issued. Our liability is only for actual loss incurred in your reliance on this Commitment to comply with its requirements, or to acquire the interest in the land. Our liability is limited to the amount shown in Schedule A of this Commitment and will be subject to the following terms of the Policy: Insuring Provisions, Conditions and Stipulations, and Exclusions.

EXHIBIT "A" CONTINUED

FIDELITY NATIONAL TITLE INSURANCE COMPANY

## SCHEDULE A

Effective Date: August 1, 2010 at 08:00 AM
GF Number: FTDAL34-FT000002534501

Commitment Number: FT000002534501, issued August 25, 2010 at 8:00 a.m.

1. The policy or policies to be issued are:
   (a) OWNER'S POLICY OF TITLE INSURANCE (Form T-1)
       (Not applicable for improved one-to-four family residential real estate)
       Policy Amount: $13,000,000.00
       PROPOSED INSURED:
       TBD
   (b) TEXAS RESIDENTIAL OWNER'S POLICY OF TITLE INSURANCE
       -- ONE-TO-FOUR FAMILY RESIDENCES (Form T-1R)
       Policy Amount:
       PROPOSED INSURED:
   (c) LOAN POLICY OF TITLE INSURANCE (Form T-2)
       Policy Amount:
       PROPOSED INSURED:
       Proposed Borrower:
   (d) TEXAS SHORT FORM RESIDENTIAL LOAN POLICY OF TITLE INSURANCE (Form T-2R)
       Policy Amount:
       PROPOSED INSURED:
       Proposed Borrower:
   (e) LOAN TITLE POLICY BINDER ON INTERIM CONSTRUCTION LOAN (Form T-13)
       PROPOSED INSURED:
       Binder Amount:
       Proposed Borrower:
   (f) OTHER
       Policy Amount:
       PROPOSED INSURED:
       Proposed Borrower:

2. The interest in the land covered by this Commitment is:

   Fee Simple

3. Record title to the land on the Effective Date appears to be vested in:

   Lodgeco Properties, Ltd., a Texas Limited Partnership - Tracts 3 and 4

   Rossco Holdings, Incorporated, a California Corporation - Tracts 4, 6, 7, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, and 22

4. Legal description of land:

   TRACT ONE: Intentionally Deleted

   TRACT TWO: Intentionally Deleted

   TRACT THREE:

   Lots Six (6), Seven (7), Eight (8), Nine (9), Ten (10), Eleven (11), Twelve (12), Thirteen (13), Fourteen (14), Fifteen (15) and Sixteen (16), Meadowland Addition, City of College Station, according to plat thereof recorded in Volume 94, Page 278 of the Deed Records of Brazos County, Texas.

FORM T-7: Commitment for Title Insurance
(Schedule A)

**EXHIBIT "A" CONTINUED**

SGR\13977SGR\1397714.95.005

TRACT FOUR:

Lot Two (2), Lodgeco Subdivision, City of College Station, according to plat thereof recorded in Volume 1996, Page 331 of the Official Records of Brazos County, Texas.

TRACT FIVE: Intentionally Deleted

TRACT SIX:

Lot Eighteen (18), Meadowland Addition, City of College Station, according to plat thereof recorded in Volume 94, Page 278 of the Deed Records of Brazos County, Texas.

TRACT SEVEN:

Lot Seventeen (17), Meadowland Addition, City of College Station, according to plat thereof recorded in Volume 94, Page 278 of the Deed Records of Brazos County, Texas.

TRACT EIGHT: Intentionally Deleted

TRACT NINE:

Lot Nineteen (19), Meadowland Addition, City of College Station, according to plat thereof recorded in Volume 94, Page 278 of the Deed Records of Brazos County, Texas.

TRACT TEN: Intentionally Deleted

TRACT ELEVEN:

Lot Two (2), North Park Section II, City of College Station, according to plat thereof recorded in Volume 494, Page 543 of the Deed Records of Brazos County, Texas.

TRACT TWELVE:

Lot Three (3), North Park Section II, City of College Station, according to plat thereof recorded in Volume 494, Page 543 of the Deed Records of Brazos County, Texas.

TRACT THIRTEEN:

Lot Ten (10), Block Two (2), North Park, City of College Station, according to plat thereof recorded in Volume 465, Page 37 of the Deed Records of Brazos County, Texas.

TRACT FOURTEEN

Lot Four (4), North Park Section II, City of College Station, according to plat thereof recorded in Volume 494, Page 543 of the Deed Records of Brazos County, Texas.

TRACT FIFTEEN:

Lot Nine (9), Block Two (2), North Park, City of College Station, according to plat thereof recorded in Volume 465, Page 37 of the Deed Records of Brazos County, Texas.

TRACT SIXTEEN:

Lot Five (5), North Park Section II, City of College Station, according to plat thereof recorded in Volume 494, Page 543 of the Deed Records of Brazos County, Texas.

FORM T-7: Commitment for Title Insurance
(Schedule A)

**EXHIBIT "A" CONTINUED**

TRACT SEVENTEEN:

Lot Seven (7), Block Two (2), North Park, City of College Station, according to plat thereof recorded in Volume 465, Page 37 of the Deed Records of Brazos County, Texas.

TRACT EIGHTEEN:

Lot Eight (8), Block Two (2), North Park, City of College Station, according to plat thereof recorded in Volume 465, Page 37 of the Deed Records of Brazos County, Texas.

TRACT NINETEEN:

Lot Five (5), Block Two (2), North Park, City of College Station, according to plat thereof recorded in Volume 465, Page 37 of the Deed Records of Brazos County, Texas.

TRACT TWENTY:

Lot Six (6), Block Two (2), North Park, City of College Station, according to plat thereof recorded in Volume 465, Page 37 of the Deed Records of Brazos County, Texas.

TRACT TWENTY-ONE:

Lot Three (3), Block Two (2), North Park, City of College Station, according to plat thereof recorded in Volume 465, Page 37 of the Deed Records of Brazos County, Texas.

TRACT TWENTY-TWO:

Lot Four (4), Block Two (2), North Park, City of College Station, according to plat thereof recorded in Volume 465, Page 37 of the Deed Records of Brazos County, Texas.

TRACT TWENTY-THREE: Intentionally Deleted

TRACT TWENTY-FOUR: Intentionally Deleted

TRACT TWENTY-FIVE: Intentionally Deleted


NOTE: COMPANY DOES NOT REPRESENT THAT THE ABOVE ACREAGE AND/OR SQUARE FOOTAGE CALCULATIONS ARE CORRECT.

# Exhibit "B"

# EARNEST MONEY ESCROW AGREEMENT

## RECITALS

Seller and Purchaser have entered into a certain purchase agreement ("Purchase Agreement") concerning real property.

In connection with the Purchase Agreement, Seller and Purchaser have requested Escrow Agent to receive funds to be held in escrow and applied in accordance with the terms and conditions of this Escrow Agreement.

NOW THEREFORE, in consideration of the above recitals, the mutual promises set forth herein and other good and valuable consideration, the parties agree as follows:

1. Escrow Agent hereby agrees to act as Escrow Agent in accordance with the terms and conditions of this Purchase and Sale Agreement.

2. INITIAL DEPOSIT/ADDITIONAL DEPOSITS. Escrow Agent shall receive an initial deposit as set forth in the Purchase and Sale Agreement between the above parties. Any additional amounts deposited with Escrow Agent shall be added to the initial deposit and together with the initial deposit shall be referred to herein collectively as the "Escrow Fund".

3. DEPOSITS OF FUNDS. All checks, money orders or drafts will be processed for collection in the normal course of business. Escrow Agent may commingle funds received by it in escrow with escrow funds of others, and may, without limitation, deposit such funds in its custodial or escrow accounts with any reputable trust company, bank, savings bank, savings association, or other financial services entity. It is understood that Escrow Agent shall be under no obligation, except to the extent instructed in writing by Seller and/or Purchaser, to invest the funds deposited with it on behalf of any depositor, nor shall it be accountable for any earnings or incidental benefit attributable to the funds which may be received by Escrow Agent while it holds such funds. Deposits held by Escrow Agent shall be subject to the provisions of applicable state statues governing unclaimed property. If Seller and Purchaser instruct Escrow Agent to deposit the Escrow Fund in an interest-bearing account, upon the depository institution's request, the Seller and/or Purchaser will execute the appropriate Internal Revenue Service documentation for the giving of taxpayer identification information relating to this account. Interest will accrue on said account at the rate provided by the institution in which the escrowed funds are deposited. The Seller and/or Purchaser are aware the Federal Deposit Insurance Corporation (FDIC) coverages apply to a maximum amount of $100,000.00 per depositor (as may be modified by the FDIC from time to time). Further, the Seller and/or Purchaser do not and will not hold Escrow Agent liable for any loss occurring which arises from bank failure or error, insolvency or suspension, or a situation or event which falls under the FDIC coverages.

All interest will accrue to and be reported to the Internal Revenue Service for the account of:

Name: _____
Address: _____
_____

Phone: _____
Tax Identification or Social Security No.: _____

Escrow Agent shall not be responsible for any penalties, or loss of principal or interest, or any delays in the withdrawal of the funds which may be imposed by the depository institution as a result of the making or redeeming of the investment pursuant to Seller and/or Purchaser instructions.

4. **DISBURSEMENT OF ESCROW FUND.** Escrow Agent may disburse all or any portion of the Escrow Fund in accordance with and in reliance upon the terms and conditions of the Purchase Agreement or upon written instructions from both Seller and Purchasers, provided however, in the event Purchaser elects to terminate this Agreement on or before the expiration of the Inspection Period, Escrow Agent shall automatically release the Escrow Fund and Earnest Money to Purchaser without any further act, consent, approval, or release by Seller. The Escrow Agent shall have no responsibility to make an investigation or determination of any facts underlying such instructions or as to whether any conditions upon which the funds are to be released have been fulfilled or not fulfilled, or to whom funds are released.

5. **DEFAULT AND/OR DISPUTES.** In the event any party to the transaction underlying this Agreement shall tender any performance after the time when such performance was due, Escrow Agent may proceed under this Agreement unless one of the parties to this Agreement shall give to the Escrow Agent written direction to stop further performance of the Escrow Agent's functions hereunder. In the event written notice of default or dispute is given to the Escrow Agent by any party, or if Escrow Agent receives contrary written instructions from any party, the Escrow Agent will promptly notify all parties of such notice. Thereafter, Escrow Agent will decline to disburse funds or to deliver any instrument or otherwise continue to perform its escrow functions, except upon receipt of a mutual written agreement of the parties or upon an appropriate order of court. In the event of a dispute, the Escrow Agent is authorized to deposit the escrow into a court of competent jurisdiction for a determination as to the proper disposition of said funds. In the event that the funds are deposited in court, the Escrow Agent shall be entitled to file a claim in the proceeding for its costs and counsel fees, if any.

6. **ESCROW AGENT FEES AND OTHER EXPENSES.** Escrow Agent shall charge for its services hereunder in accordance with its current schedule of fees (which includes annual maintenance fees) unless otherwise provided. Unless otherwise directed, such fees shall be charged to the Purchaser and Seller equally. All fees, charges and expenses are due and payable at settlement and such amounts may be deducted by Escrow Agent from any funds held in escrow due to the party from whom such amounts are due and owing. Additional amounts which may become due for any reason shall be promptly paid to Escrow Agent by the party owing such amounts. Escrow Agent shall not be required to advance its own funds for any purpose provided that any such advance, made at its option, shall be promptly reimbursed by the party for whom it is advanced, and such optional advance shall not be an admission of liability on the part of Escrow Agent.

7. **PERFORMANCE OF DUTIES.** In performing any of its duties under this Agreement, or upon the claimed failure to perform its duties hereunder, Escrow Agent shall not be liable to anyone for any damages, losses or expenses which may occur as a result of Escrow Agent so acting, or failing to act; provided, however, Escrow Agent shall be liable for damages arising out of its willful default or gross negligence under this Agreement. Accordingly, Escrow Agent shall not incur any such liability with respect to (i) any good faith act or omission upon advice of counsel given with respect to any questions relating to the duties and responsibilities of Escrow Agent hereunder, or (ii) any good faith act or omission in reliance upon any document, including any written notice or instructions provided for in the Agreement, not only as to its due execution and to the validity and effectiveness of its provisions but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the proper person or persons and to conform with the provisions of this Agreement.

8. **HOLD HARMLESS.** Purchaser and Seller shall indemnify the Escrow Agent and hold the Escrow Agent harmless from all damage, costs, claims and expenses arising from performance of its duties as Escrow Agent including reasonable attorneys' fees, except for those damages, costs, claims and expenses resulting form the gross negligence or willful misconduct of the Escrow Agent.

9. **TERMINATION.** This Agreement shall terminate upon the first to occur of ( a ) three years from the date hereof, in which event Escrow Agent shall disburse the Escrow Fund to the person who deposited such funds, less Escrow Agent's fees and expenses, unless this Agreement is extended by written agreement of all parties including the Escrow Agent; ( b ) the disbursement by Escrow Agent of all of the Escrow Fund; ( c ) the joint written instructions of Purchaser and Seller; ( d ) the resignation of Escrow Agent upon reasonable notice to Purchaser and Seller and the transfer of the Escrow Fund to their designated replacement Escrow Agent.

10. **RELEASE OF PAYMENT.** Payment of the funds so held in escrow by the Escrow Agent, in

accordance with the terms, conditions and provisions of this Escrow Agreement, shall fully and completely discharge and exonerate the Escrow Agent from any and all future liability or obligations of any nature or character at law or equity to the parties hereto or under this Agreement.

11.  NOTICES.

**Seller**: _____, LLC
Address:_____
Fax:    _____

**Purchaser**: PMH Acquisition, LLC
Address:_____
Fax:    _____

To **Escrow Agent**:

_____
_____
_____

12.  This Agreement shall be binding upon and inure to the benefit of the parties' respective successors and assigns.

13.  This Agreement shall be governed by and construed in accordance with the Laws of the State of where the Property is located.

# Exhibit "C"

Rent Roll (Attached)

133M
Select 09/03/2010
60 APTS. 33704 Sq. Ft.
Rent Roll as of 9/3/2010

Meadowland Apartments
133 Meadowland Street #D
College Station, TX 77840

September 3, 2010

| Apt. | Type | Apt. Status | Names | Sq.Ft. | Market Rent | Code | Lease Charges | Gross Possible | Actual Potential Charges | M/I Date M/O Date | Lease Expires Term | Sec/Other Deposit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 133A | 1x1 w FP | OC | Rudolph Seller | 525 | 495.00 | RENT | $525.00 | $595.00 | $ ___ | 1/18/2010 | 11/30/2010 | $150.00 |
| 141C | 2x1 | OC | Nischal Kafle | 598 | $525.00 | RENT | $525.00 | $525.00 | $ ___ | 8/1/2010 | 5/31/2011 | $150.00 |

# Exhibit "D"

Lease Form (Attached)


**TEXAS APARTMENT ASSOCIATION MEMBER**

*This Lease Contract is only valid if filled out before January 2011.*

## Apartment Lease Contract

Date of Lease Contract: **12-22-09**
(when this Lease Contract is filled out)

*This is a binding contract. Read carefully before signing.*

### Moving In — General Information

1. **PARTIES.** This Lease Contract is between you, the resident(s) (list all people signing the Lease Contract):

   **Rudolph Seiler**

   and us, the owner: **BCSK Management**
   (name of apartment community or title holder). You've agreed to rent Apartment No. **133A**, at **Meadowland Street** (street address) in **College Station** (city), Texas, **77840** (zip code) for use as a private residence only. The terms "you" and "your" refer to all residents listed above, and a person authorized to act in the event of a sole resident's death. The terms "we," "us," and "our" refer to the owner listed above and not to property managers or anyone else. Written notice to or from our managers constitutes notice to or from us. If anyone else has guaranteed performance of this Lease Contract, a separate Lease Contract Guaranty for each guarantor must be executed.

2. **OCCUPANTS.** The apartment will be occupied only by you and (list all other occupants not signing the Lease Contract):

   **Joseph Seiler (06-05-88)**

   No one else may occupy the apartment. Persons not listed above must not stay in the apartment for more than **3** consecutive days without our prior written consent, and no more than twice that many days in any one month. *If the previous space isn't filled in, two days per month is the limit.*

3. **LEASE TERM.** The initial term of the Lease Contract begins on the **18** day of **January**, **2010** (year), and ends at midnight the **31** day of **May**, **2010** (year). This Lease Contract will automatically renew month-to-month unless either party gives at least **30** days written notice of termination or intent to move-out as required by paragraph 37. *If the number of days isn't filled in, at least 30 days notice is required.*

4. **SECURITY DEPOSIT.** The total security deposit for all residents is $**150**, due on or before the date this Lease Contract is signed. This amount [checkone] ☐ does or ☒ does not include an animal deposit. Any animal deposit will be stated in an animal addendum. See paragraphs 41 and 42 for security deposit return information.

5. **KEYS, FURNITURE AND AFFIDAVIT OF MOVE-OUT.** You will be provided **2** apartment key(s), **∅** mailbox key(s), and **∅** other access devices for **∅**. Any resident, occupant, or spouse who, according to a remaining resident's affidavit, has permanently moved out or is under court order to not enter the apartment, is (at our option) no longer entitled to occupancy, keys, or other access devices. Your apartment will be [check one] ☒ furnished or ☐ unfurnished.

6. **RENT AND CHARGES.** You will pay $**595.00** per month for rent, in advance and without demand:
   ☒ at the onsite manager's office
   ☐ through our online payment site
   ☐ at _____

   Prorated rent of $**277.66** is due for the remainder of [check one] ☐ 1st month or ☐ 2nd month, on _____ (year). Otherwise, you must pay your rent on or before the 1st day of each month (due date) with no grace period. Cash is unacceptable without our prior written permission. You must not withhold or offset rent unless authorized by statute. We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. If you don't pay all rent on or before the **5th** day of the month and we haven't given notice to vacate for the current month before that date, you'll pay an initial late charge of $**50.00** plus a daily late charge of $**∅** per day after

that date until paid in full. Daily late charges will not exceed 15 days for any single month's rent. We will not impose late charges until at least the third day of the month. You'll also pay a charge of $**35.00** for each returned check or rejected electronic payment, plus initial and daily late charges until we receive acceptable payment. If you don't pay rent on time, you'll be in default and all remedies under state law and this Lease Contract will be authorized. If you violate the animal restrictions of paragraph 27 or other animal rules, you'll pay an initial charge of $**100.00** per animal (not to exceed $100 per animal) and a daily charge of $**10.00** per animal (not to exceed $10 per day per animal) from the date the animal was brought into your apartment until it is finally removed. We'll also have all other remedies for such violation.

7. **UTILITIES.** We'll pay for the following items, if checked: ☐ gas ☒ water ☐ wastewater ☒ electricity ☐ trash ☒ cable TV ☐ master antenna ☐ Internet service ☐ other utilities _____
   You'll pay for all other utilities, related deposits, and any charges or fees on such utilities during your Lease Contract term. You must not allow any utilities (other than cable or Internet) to be cut off or switched for any reason—including disconnection for not paying your bills—until the Lease Contract term or renewal period ends. If a utility is submetered or prorated by an allocation formula, we will attach an addendum to this Lease Contract in compliance with state agency rules. If a utility is individually metered, it must be connected in your name and you must notify the utility provider of your move-out date so the meter can be timely read. If you delay getting it turned on in your name by lease commencement or cause it to be transferred back into our name before you surrender or abandon the apartment, you'll be liable for a $**50.00** charge (not to exceed $50), plus the actual or estimated cost of the utilities used while the utility should have been connected in your name. If you are in an area open to competition and your apartment is individually metered you may choose or change your retail electric provider at any time. If you qualify, your provider will be the same as ours, unless you choose a different provider. If you choose or change your provider, you must give us written notice. You must pay all applicable provider fees, including any fees to change service back into our name after you move out.

8. **INSURANCE.** Our insurance does not cover the loss of or damage to your personal property. You are [check one]:
   ☐ required to buy and maintain renter's or liability insurance (see attached addendum), or
   ☒ not required to buy renter's or liability insurance.
   *If neither is checked, insurance is not required but is still strongly recommended. If not required, we urge you to get your own insurance for losses due to theft, fire, water damage, pipe leaks and other similar occurrences. Renter's insurance does not cover losses due to a flood. Information on renter's insurance is available from the Texas Department of Insurance.*

9. **SECURITY DEVICES.** What We Must Provide. Texas law requires, with some exceptions, that we must provide at no cost to you when occupancy begins: (1) a window latch on each window; (2) a door viewer (peephole) on each exterior door; (3) a pin lock on each sliding door; (4) either a door handle latch or a security bar on each sliding door; (5) a keyless bolting device (deadbolt) on each exterior door; and (6) either a keyed doorknob lock or a keyed deadbolt lock on one entry door. Keyed lock(s) will be rekeyed after the prior resident moves out. The rekeying will be done either before you move in or within 7 days after you move in, as required by statute. If we fail to install or rekey security devices as required by law, you have the right to do so and deduct the reasonable cost from your next rent payment under Section 92.165(1), Texas Property Code.

   What You Are Now Requesting. Subject to some limitations, under Texas law you may at any time ask us to: (1) install one keyed deadbolt lock on an exterior door if it does not have one; (2) install a security bar on a sliding glass door if it does not have one; and (3) change or rekey locks or latches. We must comply with these requests, but you must pay for them. Subject to statutory restrictions on what security devices you may request, you are now requesting us to install or change at your expense: _____
   _____ *If nothing is filled in, then you are requesting none at this time.*
   Payment. We will pay for missing security devices that are required by statute. You will pay for: (1) rekeying that you request (except when we failed to rekey after the previous resident moved out); and (2) repairs or replacements due to misuse or damage by you or your family, occupants, or guests. You must pay immediately after the work is done unless state statute authorizes advance payment. You also must pay for additional or changed security devices you request, in advance or afterward, at our option.

### Special Provisions and "What If" Clauses

10. **SPECIAL PROVISIONS.** The following or attached special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease Contract and will supersede any conflicting provisions of this printed Lease Contract form.

    **A pet addendum for a less than 50 lbs dog with a $300 pet deposit will be added to this contract.**

11. **UNLAWFUL EARLY MOVE-OUT; RELETTING CHARGE.** You'll be liable for a reletting charge of $**505.75** (not to exceed 85% of the highest monthly rent during the Lease Contract term) if you:
    (1) fail to move in, or fail to give written move-out notice as required in paragraphs 23 or 37; or
    (2) move out without paying rent in full for the entire Lease Contract term or renewal period; or
    (3) move out at our demand because of your default; or
    (4) are judicially evicted.

    *The reletting charge is not a cancellation fee and does not release you from your obligations under this Lease Contract. See the first paragraph of page 2.*

Your Initials: _R.S._ _R.S._

Not a Release. The reletting charge is not a Lease Contract cancellation or buyout fee. It is a liquidated amount covering only part of our damages; that is, our time, effort, and expense in finding and processing a replacement. These damages are uncertain and difficult to ascertain—particularly those relating to make ready, inconvenience, paperwork, advertising, showing apartments, utilities for showing, checking prospects, overhead, marketing costs, and locator-service fees. You agree that the reletting charge is a reasonable estimate of such damages and that the charge is due whether or not our reletting attempts succeed. If no amount is stipulated, you must pay our actual reletting costs so far as they can be determined. The reletting charge does not release you from continued liability for: future or past-due rent; charges for cleaning, repairing, repainting, or unreturned keys, or other sums due.

12. **DAMAGES AND REIMBURSEMENT.** You must promptly pay or reimburse us for loss, damage, consequential damages, government fines or charges, or cost of repairs or service in the apartment community due to: a violation of the Lease Contract or rules; improper use; negligence; other conduct by you or your invitees, guests or occupants; or any other cause not due to our negligence or fault. You will indemnify and hold us harmless from all liability arising from the conduct of you, your invitees, guests, or occupants, or our representatives who perform at your request services not contemplated in this Lease Contract. Unless the damage or wastewater stoppage is due to our negligence, we're not liable for—and you must pay for—repairs, replacements and damage to the following if occurring during the Lease Contract term or renewal period: (1) damage to doors, windows, or screens; (2) damage from windows or doors left open; and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment. We may require payment at any time, including advance payment of repairs for which you're liable. Delay in demanding sums you owe is not a waiver.

13. **CONTRACTUAL LIEN AND PROPERTY LEFT IN APARTMENT.** All property in the apartment is (unless exempt under Section 54.042, Texas Property Code) subject to a contractual lien to secure payment of delinquent rent (except as prohibited by Section 2306.6736, Texas Government Code, for owners supported by housing tax credit allocations). For this purpose, "apartment" excludes common areas but includes interior living areas and exterior patios, balconies, attached garages, and storerooms for your exclusive use.

Removal After We Exercise Lien for Rent. If your rent is delinquent, our representative may peacefully enter the apartment and remove and/or store all property subject to lien. Written notice of entry must be left afterwards in the apartment in a conspicuous place—plus a list of items removed. The notice must state the amount of delinquent rent and the name, address, and phone number of the person to contact about the amount owed. The notice must also state that the property will be promptly returned when the delinquent rent is fully paid. All property in the apartment is presumed to be yours unless proven otherwise.

Removal After Surrender, Abandonment, or Eviction. We or law officers may remove or store all property remaining in the apartment or in common areas (including any vehicles you or any occupant or guest owns or uses) if you are judicially evicted or if you surrender or abandon the apartment (see definitions in paragraph 42).

Storage. We will store property removed under a contractual lien. We may, but have no duty to, store property removed after judicial eviction, surrender, or abandonment of the apartment. We're not liable for casualty loss, damage, or theft except for property removed under a contractual lien. You must pay reasonable charges for our packing, removing, storing, and selling any property. We have a lien on all property removed and stored after surrender, abandonment, or judicial eviction for all sums you owe, with one exception: Our lien on property listed under Texas Property Code Section 54.042 is limited to charges for packing, removing, and storing.

Redemption. If we've seized and stored property under a contractual lien for rent as authorized by law, you may redeem the property by paying all delinquent rent due at the time of seizure. But if notice of sale (set forth as follows) is given before you seek redemption, you may redeem only by paying the delinquent rent and reasonable charges for packing, removing, and storing. If we've removed and stored property after surrender, abandonment, or judicial eviction, you may redeem only by paying all sums you owe, including rent.

18. **COMMUNITY POLICIES OR RULES.** You and all guests and occupants must comply with any written apartment rules and community policies, including instructions for care of our property. Our rules are considered part of this Lease Contract. We may make reasonable changes to written rules, effective immediately, if they are distributed and applicable to all units in the apartment community and do not change dollar amounts on page 1 of this Lease Contract.

19. **LIMITATIONS ON CONDUCT.** The apartment and other areas reserved for your private use must be kept clean. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care in accordance with apartment rules and posted signs. Glass containers are prohibited in or near pools and all other common areas. You, your occupants, or guests may not anywhere in the apartment community use candles or use kerosene lamps or heaters without our prior written approval; cook on balconies or outside, or solicit business or contributions. Conducting any kind of business (including child care services) in your apartment or in the apartment community is prohibited—except that any lawful

late charges, reletting charges, storage, damages, etc. We may return redeemed property at the place of storage, the management office, or the apartment (at our option). We may require payment by cash, money order, or certified check.

Disposition or Sale. Except for animals and property removed after the death of a sole resident, we may throw away or give to a charitable organization all items of personal property that are: (1) left in the apartment after surrender or abandonment; or (2) left outside more than 1 hour after writ of possession is executed, following judicial eviction. Animals removed after surrender, abandonment, or eviction may be kenneled or turned over to local authorities or humane societies. Property not thrown away or given to charity may be disposed of only by sale, which must be held no sooner than 30 days after written notice of date, time, and place of sale is sent by both regular mail and certified mail (return receipt requested) to your last known address. The notice must itemize the amounts you owe and the name, address, and phone number of the person to contact about the sale, the amount owed, and your right to redeem the property. Sale may be public or private, is subject to any third-party ownership or lien claims, must be to the highest cash bidder, and may be in bulk, in batches, or item-by-item. Proceeds exceeding sums owed must be mailed to you at your last known address within 30 days after sale.

14. **FAILING TO PAY FIRST MONTH'S RENT.** If you don't pay the first month's rent when or before the Lease Contract begins, all future rent will be automatically accelerated without notice and immediately due. We also may end your right of occupancy and recover damages, future rent, reletting charges, attorney's fees, court costs, and other lawful charges. Our rights, remedies, and duties under paragraphs 11 and 32 apply to acceleration under this paragraph.

15. **RENT INCREASES AND LEASE CONTRACT CHANGES.** No rent increases or Lease Contract changes are allowed before the initial Lease Contract term ends, except for changes allowed by any special provisions in paragraph 10, by a written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed under paragraph 18. If, at least 5 days before the advance notice deadline referred to in paragraph 3, we give you written notice of rent increases or Lease Contract changes effective when the Lease Contract term or renewal period ends, this Lease Contract will automatically continue month-to-month with the increased rent or Lease Contract changes. The new modified Lease Contract will begin on the date stated in the notice (without necessity of your signature) unless you give us written move-out notice under paragraph 37. The written move-out notice under paragraph 37 applies only to the end of the current Lease Contract or renewal period.

16. **DELAY OF OCCUPANCY.** If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, we're not responsible for the delay. The Lease Contract will remain in force subject to: (1) abatement of rent on a daily basis during delay; and (2) your right to terminate as set forth below. Termination notice must be in writing. After termination, you are entitled only to refund of deposit(s) and any rent paid. Rent abatement or Lease Contract termination does not apply if delay is for cleaning or repairs that don't prevent you from occupying the apartment.

If there is a delay and we haven't given notice of delay as set forth immediately below, you may terminate up to the date when the apartment is ready for occupancy, but not later.

(1) If we give written notice to any of you when or after the Lease Contract begins—and the notice states that occupancy has been delayed because of construction or a previous resident's holding over, and that the apartment will be ready on a specific date— you may terminate the Lease Contract within 3 days of your receiving the notice, but not later.

(2) If we give written notice to any of you before the effective Lease Contract date and the notice states that construction delay is expected and that the apartment will be ready for you to occupy on a specific date, you may terminate the Lease Contract within 7 days after any of you receives written notice, but not later. The readiness date is considered the new effective Lease Contract date for all purposes. This new date may not be moved to an earlier date unless we and you agree.

17. **DISCLOSURE RIGHTS.** If someone requests information on you or your rental history for law-enforcement, governmental, or business purposes, we may provide it. At our request, any utility provider may furnish us information about pending or actual connections or disconnections of utility service to your apartment.

business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, or other business associates do not come to your apartment for business purposes. We may regulate: (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and delivery persons; and (3) activities in common areas.

We may exclude from the apartment community guests or others who, in our judgment, have been violating the law, violating this Lease Contract or any apartment rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area a person who refuses to show photo identification or refuses to identify himself or herself as a resident, occupant, or guest of a specific resident in the community.

You will notify us within 15 days if you or any occupants are convicted of any felony, or misdemeanor involving a controlled substance, violence to another person or destruction of property. You also agree to notify us within 15 days if you or any occupants register as a sex offender in any state. Informing us of criminal convictions or sex offender registry does not waive any rights we have against you.

20. **PROHIBITED CONDUCT.** You and your occupants or guests may not engage in the following activities: criminal conduct; behaving in

Apartment Lease Contract A [initials] NK ©2009, Texas Apartment Association, Inc.

a loud or obnoxious manner; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community; disrupting our business operations; manufacturing, delivering, or possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the apartment community; displaying or possessing a gun, knife, or other weapon in the common area in a way that may alarm others; storing anything in closets having gas appliances; tampering with utilities or telecommunications; bringing hazardous materials into the apartment community; using windows for entry or exit; heating the apartment with a gas-operated cooking stove or oven; or injuring our reputation by making bad faith allegations against us to others.

21. **PARKING.** We may regulate the time, manner, and place of parking all cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles. Motorcycles or motorized bikes may not be parked inside an apartment or on sidewalks, under stairwells, or in handicapped parking areas. We may have unauthorized or illegally parked vehicles towed or booted according to state law at the owner or operator's expense at any time if it:
    (1) has a flat tire or is otherwise inoperable
    (2) is on jacks, blocks or has wheel(s) missing
    (3) takes up more than one parking space
    (4) belongs to a resident or occupant who has surrendered or abandoned the apartment
    (5) is in a handicap space without the legally required handicap insignia
    (6) is in a space marked for office visitors, managers, or staff
    (7) blocks another vehicle from exiting
    (8) is in a fire lane or designated "no parking" area
    (9) is in a space marked for other resident(s) or apartment(s)
    (10) is on the grass, sidewalk, or patio
    (11) blocks garbage trucks from access to a dumpster, or
    (12) has no current license, registration or inspection sticker, and we give you at least 10 days notice that the vehicle will be towed if not removed.

22. **RELEASE OF RESIDENT.** Unless you're entitled to terminate this Lease Contract under paragraphs 10, 16, 23, 31 or 37, you won't be released from this Lease Contract for any reason—including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment, bad health, death, or property purchase.

    Death of Sole Resident. If you are the sole resident, upon your death you may terminate the Lease Contract without penalty with at least 30 days written notice. You will be liable for payment of rent until the latter of: (1) the termination date, or (2) until all possessions in the apartment are removed. You will be liable for all rent, charges, and damages to the apartment until it is vacated, and any removal and storage costs.

23. **MILITARY PERSONNEL CLAUSE.** You may terminate the Lease Contract if you enlist or are drafted or commissioned in the U.S. Armed Forces. You also may terminate the Lease Contract if:
    (1) you are (i) a member of the U.S. Armed Forces or reserves on active duty or (ii) a member of the National Guard called to active duty for more than 30 days in response to a national emergency declared by the President; and
    (2) you (i) receive orders for permanent change-of-station, (ii) receive orders to deploy with a military unit or as an individual in support of a military operation for 90 days or more, or (iii) are relieved or released from active duty.

    After you deliver to us your written termination notice, the Lease Contract will be terminated under this military clause 30 days after the date on which your next rental payment is due. You must furnish us a copy of your military orders, such as permanent change-of-station orders, call-up orders, or deployment orders or letter. Military permission for base housing doesn't constitute a permanent change-of-station order. After your move out, we'll return your security deposit, less lawful deductions. For the purposes of this Lease Contract, orders described in (2) above will only release the resident who qualifies under (1) and (2) above and receives the orders during the Lease Contract term and such resident's spouse or legal dependents living in the resident's household. A co-resident who is not your spouse or dependent cannot terminate under this military clause. Unless you state otherwise in paragraph 10, you represent when signing this Lease Contract that: (1) you do not already have a deployment or change-of-station orders; (2) you will not be retiring from the military during the Lease Contract term; and (3) the term of your enlistment or obligation will not end before the Lease Contract term ends. Liquidated damages for making a false representation of the above will be the amount of unpaid rent for the remainder of the lease term when and if you move out, less rents from others received in mitigation under paragraph 32. You must immediately notify us if you are called to active duty or receive deployment or permanent change-of-station orders.

24. **RESIDENT SAFETY AND LOSS.** You and all occupants and guests must exercise due care for your own and others' safety and security, especially in the use of smoke and other detection devices, door and window locks, and other safety or security devices. You agree to make every effort to follow the Security Guidelines on page 5. Window screens are not for security or keeping people from falling out.

    Detection Devices. We'll furnish smoke or other detection devices required by statute or city ordinance, and we'll test them and provide working batteries when you first take possession. After that, you must pay for and replace batteries as needed, unless the law provides otherwise. We may replace dead or missing batteries at your expense, without prior notice to you. You must immediately report detector malfunctions to us. Neither you nor others may disable detectors. If you damage or disable the smoke detector, or remove a battery without replacing it with a working battery, you may be liable to us under Section 92.2611, Texas Property Code for $100 plus one month's rent, actual damages, and attorney's fees. You also will be liable to us and others if you fail to report malfunctions, or any loss, damage, or fines resulting from fire, smoke, or water. Upon request, we will provide, as required by law, a smoke detector capable of alerting a person with a hearing-impairment disability.

    Loss. We're not liable to any resident, guest, or occupant for personal injury or damage, loss of personal property, or business or personal income from any cause, including, but not limited to, fire, smoke, rain, flood, water leaks, hail, ice, snow, lightning, wind, explosions, interruption of utilities, pipe leaks, theft, negligent or intentional acts of residents, occupants or guests, or vandalism unless otherwise required by law. We have no duty to remove any ice, sleet, or snow but may remove any amount with or without notice. Unless we instruct otherwise, you must—for 24 hours a day during freezing weather—(1) keep the apartment heated to at least 50 degrees; (2) keep cabinet and closet doors open; and (3) drip

hot and cold water faucets. You'll be liable for damage to our and others' property if damage is caused by broken water pipes due to your violating these requirements.

Crime or Emergency. Dial 911 or immediately call local medical emergency, fire, or police personnel in case of accident, fire, smoke, suspected criminal activity, or other emergency involving imminent harm. You should then contact our representative. You won't treat any of our security measures as an express or implied warranty of security, or as a guarantee against crime or of reduced risk of crime. Unless otherwise provided by law, we're not liable to you or any guests or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. Even if previously provided, we're not obligated to furnish security personnel, patrols, lighting, gates or fences, or other forms of security unless required by statute. We're not responsible for obtaining criminal-history checks on any residents, occupants, guests, or contractors in the apartment community. If you or any occupant or guest is affected by a crime, you must make a written report to our representative and in the appropriate local law-enforcement agency. You also must furnish us with the law-enforcement agency's incident report number upon request.

25. **CONDITION OF THE PREMISES AND ALTERATIONS.** You accept the apartment, fixtures, and furniture as is, except for conditions materially affecting the health or safety of ordinary persons. We disclaim all implied warranties. You'll be given an Inventory & Condition form on or before move-in. Within 48 hours after move-in, you must sign and note on the form all defects or damage and return it to us. Otherwise, everything will be considered to be in a clean, safe, and good working condition.

    You must use customary diligence in maintaining the apartment and not damaging or littering the common areas. Unless authorized by statute or by us in writing, you must not do any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the apartment. We'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and grooves of wood-paneled walls, unless our rules state otherwise. No water furniture, washing machines, extra phone or TV-cable outlets, alarm systems, or lock changes, additions, or rekeying is permitted unless allowed by statute or we've consented in writing. You may install a satellite dish or antenna provided you sign our satellite dish or antenna lease addendum which complies with reasonable restrictions allowed by federal law. You agree not to alter, damage, or remove our property, including alarm systems, detection devices, furniture, telephone and cable TV wiring, screens, locks, and security devices. When you move in, we'll supply lightbulbs for livings we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the apartment (whether or not we consent) become ours unless we agree otherwise in writing.

    We are committed to the principles of fair housing. In accordance with fair housing laws, we will make reasonable accommodations to our rules, policies, practices or services, and/or will allow reasonable modifications under such laws to give persons with disabilities access to and use of this apartment community. We may require you to sign an addendum regarding the approval and implementation of such accommodations or modifications, as well as restoration obligations, if any.

26. **REQUESTS, REPAIRS, AND MALFUNCTIONS.** If you or any occupant needs to send a notice or request—for example, for repairs, installations, services, ownership disclosure or security-related matters—IT MUST BE SIGNED AND IN WRITING to our designated representative (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, crime in progress, or fair housing accommodation or modification). Our written notes on your oral request do not constitute a written request from you.

    Our complying with or responding to any oral request regarding security or any other matters doesn't waive the strict requirement for written notices under this Lease Contract. You must promptly notify us in writing of: water leaks; mold; electrical problems; malfunctioning lights; broken or missing locks or latches; and other conditions that pose a hazard to property, health, or safety. We may change or install utility lines or equipment serving the apartment if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately. Air conditioning problems are normally not emergencies. If air conditioning or other equipment malfunctions, you must notify us as soon as possible on a business day. We'll act with customary diligence to make repairs and reconnections, taking into consideration when casualty insurance proceeds are received. Rent will not abate in whole or in part.

    If we believe that fire or catastrophic damage is substantial, or that performance of needed repairs poses a danger to you, we may terminate this Lease Contract by giving you at least 5 days written notice. We may also remove personal property if it causes a health or safety hazard. If the Lease Contract is so terminated, we'll refund prorated rent and all deposits, less lawful deductions.

27. **ANIMALS.** No animals (including mammals, reptiles, birds, fish, rodents, amphibians, arachnids, and insects) are allowed, even temporarily, anywhere in the apartment or apartment community unless we've so authorized in writing. If we allow an animal, you must sign a separate animal addendum and pay an animal deposit. An animal deposit is considered a general security deposit. We will authorize a support animal for a disabled person, but will not require an animal deposit. We may require a written statement from a qualified professional verifying the need for the support animal. You must not feed stray or wild animals.

    If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this Lease Contract. If an animal has been in the apartment at any time during your term of occupancy (with or without our consent), we'll charge you for defleaing, deodorizing, and shampooing. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead (except for attorney's fees and litigation costs) in enforcing animal restrictions and rules. We may remove an unauthorized animal by (1) leaving, in a conspicuous place in the apartment, a 24-hour written notice of intent to remove the animal, and (2) following the procedures of paragraph 28. We may keep or kennel the animal

_____ Initials of Our Representative _____

or turn it over to a humane society or local authority; ...on keeping or kenneling an animal, we won't be liable for loss, harm, sickness, or death of the animal unless due to our negligence. We'll return the animal to you upon request if it has not already been turned over to a humane society or local authority. You must pay for the animal's reasonable care and kenneling charges. We have no lien on the animal for any purpose.

28. **WHEN WE MAY ENTER.** If you or any guest or occupant is present, then repairers, servicers, contractors, our representatives, or other persons listed in (2) below may peacefully enter the apartment at reasonable times for the purposes listed in (2) below. If nobody is in the apartment, then such persons may enter peacefully and at reasonable times by duplicate or master key (or by breaking a window or other means when necessary) if:

(1) written notice of the entry is left in a conspicuous place in the apartment immediately after the entry; and

(2) entry is for: responding to your request; making repairs or replacements; estimating repair or refurbishing costs; performing pest control; doing preventive maintenance; checking for water leaks; changing filters; testing or replacing detection device batteries; retrieving unreturned tools, equipment, or appliances; preventing waste of utilities; exercising our contractual lien; leaving notices; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or security devices; removing or rekeying unauthorized security devices; removing unauthorized window coverings; stopping excessive noise; removing health or safety hazards (including hazardous materials), or items prohibited under our rules; removing perishable foodstuffs if your electricity is disconnected; removing unauthorized animals; disconnecting utilities involving bona fide repairs, emergencies or construction; retrieving property

owned or leased by former residents; inspecting when immediate danger to person or property is reasonably suspected; allowing persons to enter as you authorized in your rental application (if you die, are incarcerated, etc.); allowing entry by a law officer with a search or arrest warrant, or in hot pursuit; showing apartment to prospective residents (after move-out or vacate notice has been given; or showing apartment to government representatives for the limited purpose of determining housing and fire ordinance compliance, and to lenders, appraisers, contractors, prospective buyers, or insurance agents.

29. **MULTIPLE RESIDENTS.** Each resident is jointly and severally liable for all Lease Contract obligations. If you or any guest or occupant violates the Lease Contract or rules, all residents are considered to have violated the Lease Contract. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. Notices and requests from any resident or occupant constitute notice from all residents. Your notice of Lease Contract termination may be given only by residents. In eviction suits, each resident is considered the agent of all other residents in the apartment for service of process. Any resident who defaults under this Lease Contract will indemnify the non-defaulting residents and their guarantors.

Security deposit refund check and any deduction itemizations will be by: (check one)
☐ one check jointly payable to all residents and mailed to any one resident we choose, OR
☐ one check payable to and mailed to _____ (specify name of one resident).
If neither is checked, then the refund will be made in one check jointly payable to all residents.

30. **REPLACEMENTS AND SUBLETTING.** Replacing a resident, subletting, or assignment is allowed only when we consent in writing. If departing or remaining residents find a replacement resident acceptable to us before moving out and we expressly consent to the replacement, subletting, or assignment, then:
(1) a reletting charge will not be due;
(2) a reasonable administrative (paperwork) fee will be due, and a rekeying fee will be due if rekeying is requested or required; and
(3) the departing and remaining residents will remain liable for all Lease Contract obligations for the rest of the original Lease Contract term.

Procedures for Replacement. If we approve a replacement resident, then, at our option: (1) the replacement resident must sign this Lease Contract with or without an increase in the total security deposit; or (2) the remaining and replacement residents must sign an entirely new Lease Contract. Unless we agree otherwise in writing, your security deposit will automatically transfer to the replacement resident as of the date we approve. The departing resident will no longer have a right to occupancy or a security deposit refund, but will remain liable for the remainder of the original Lease Contract term unless we agree otherwise in writing—even if a new Lease Contract is signed.

31. **RESPONSIBILITIES OF OWNER.** We'll act with customary diligence to:
(1) keep common areas reasonably clean, subject to paragraph 25;
(2) maintain fixtures, hot water, heating, and A/C equipment;
(3) substantially comply with all applicable laws regarding safety, sanitation, and fair housing; and
(4) make all reasonable repairs, subject to your obligation to pay for damages for which you are liable.

If we violate any of the above, you may possibly terminate this Lease Contract and exercise other remedies under Texas Property Code Section 92.056 by following this procedure:
(a) all rent must be current and you must make a written request for repair or remedy of the condition—after which we'll have a reasonable time for repair or remedy;
(b) if we fail to do so, you must make a second written request for the repair or remedy (to make sure that there has been no miscommunication between us)—after which we'll have a reasonable time for the repair or remedy; and
(c) if the repair or remedy still hasn't been accomplished within that reasonable time period, you may immediately terminate this Lease Contract by giving us a final written notice. You also may exercise other statutory remedies, including those under Texas Property Code Section 92.0561.

Instead of giving the two written requests referred to above, you may give us one request by certified mail, return receipt requested, or by registered mail—after which we will have a reasonable time for repair or remedy. "Reasonable time" takes into account the nature of the problem and the reasonable availability of materials, labor, and utilities. Your rent must be current at the time of any request. We will refund security deposits and prorated rent as required by law.

32. **DEFAULT BY RESIDENT.** You'll be in default if: (1) you don't pay rent or other amounts that you owe on time; (2) you or any guest or occupant violates this Lease Contract, apartment rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (3) you abandon the apartment; (4) you give incorrect or false answers in a rental application; (5) you or any occupant is arrested, charged, detained, convicted, or given deferred adjudication or pretrial diversion for (i) a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marihuana, or drug paraphernalia as defined in the Texas Controlled Substances Act, or (ii) any sex-related crime, including a misdemeanor (6) any illegal drugs or paraphernalia are found in your apartment; or (7) you or any occupant, in bad faith, makes an invalid habitability complaint to an official or employee of a utility company or the government.

Eviction. If you default, we may end your right of occupancy by giving you a 24-hour written notice to vacate. Notice may be by: (1) regular mail; (2) certified mail, return receipt requested; (3) personal delivery to any resident; (4) personal delivery at the apartment to any occupant over 16 years old; or (5) affixing the notice to the inside of the apartment's main entry door. Notice by mail only will be considered delivered on the earlier of: (1) actual delivery, or (2) three days (not counting Sundays or federal holidays) after the notice is deposited in the U.S. Postal Service with postage. Termination of your possession rights or subsequent reletting doesn't release you from liability for future rent or other Lease Contract obligations. After giving notice to vacate or

filing an eviction suit, we may still accept rent or other sums due; the filing or acceptance doesn't waive or diminish our right of eviction, or any other contractual or statutory right. Accepting money at any time doesn't waive our right to damages; past or future rent or other sums; or to continue with eviction proceedings.

Acceleration. All monthly rent for the rest of the Lease Contract term or renewal period will be accelerated automatically without notice or demand (before or after acceleration) and will be immediately due and delinquent if, without our written consent (1) you move out, remove property in preparing to move out, or give oral or written notice (by you or any occupant) of intent to move out before the Lease Contract term or renewal period ends; and (2) you've not paid all rent for the entire Lease Contract term or renewal period. Such conduct is considered a default for which we need not give you notice. Remaining rent also will be accelerated if you're judicially evicted or move out when we demand because you've defaulted. Acceleration is subject to our mitigation obligations below.

Holdover. You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then: (1) holdover rent is due in advance on a daily basis and may become delinquent without notice or demand; (2) rent for the holdover period will be increased by 25% over the then-existing rent, without notice; (3) you'll be liable to us (subject to our mitigation duties) for all rent for the full term of the previously signed Lease Contract of a new resident who can't occupy because of the holdover; and (4) at our option, we may extend the Lease Contract term—for up to one month from the date of notice of Lease Contract extension—by delivering written notice to you or your apartment while you continue to hold over.

Other Remedies. We may report unpaid amounts to credit agencies. If you default and move out early, you will pay us any amounts stated to be rental discounts or concessions agreed to in writing, in addition to other sums due. Upon your default, we have all other legal remedies, including Lease Contract termination and statutory lockout under Section 92.0081, Texas Property Code, except as lockouts and liens are prohibited by Section 2306.6738, Texas Government Code, for owners supported by housing tax credit allocations. A prevailing party may recover reasonable attorney's fees and all other litigation costs from the non-prevailing parties, except a party may not recover attorney's fees and litigation costs in connection with a party's claims seeking personal injury, sentimental, exemplary or punitive damages. We may recover attorneys' fees in connection with enforcing our rights under this Lease Contract. You agree that late charges are liquidated damages and a reasonable estimate of such damages for our time, inconvenience, and overhead associated with collecting late rent (but are not for attorney's fees and litigation costs). All unpaid amounts you owe, including judgments, bear 18% interest per year from due date, compounded annually. You must pay all collection-agency fees if you fail to pay all sums due within 10 days after we mail you a letter demanding payment and stating that collection agency fees will be added if you don't pay all sums by that deadline.

Mitigation of Damages. If you move out early, you'll be subject to paragraph 31 and all other remedies. We'll exercise customary diligence to relet and minimize damages. We'll credit all subsequent rent that we actually receive from subsequent residents against your liability for past-due and future rent and other sums due.

APARTMENT LEASE CONTRACT   © 2009, Texas Apartment Association, Inc.

## General Clauses

33. **MISCELLANEOUS.** Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease Contract is the entire agreement between you and us. Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease Contract or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives unless in writing. No action or omission by us will be considered a waiver of our rights or of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, acceleration, liens, or other rights isn't a waiver under any circumstances. Except when notice or demand is required by statute, you waive any notice and demand for performance from us if you default. Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease Contract should retain a copy of the memo, letter, or fax that was given, as well as any fax transmittal verification. Fax or electronic signatures are binding. All notices must be signed. Notices may not be given by email or other electronic transmission.

    Exercising one remedy won't constitute an election or waiver of other remedies. Insurance subrogation is waived by all parties. All remedies are cumulative. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf. This Lease Contract binds subsequent owners. Neither an invalid clause nor the omission of initials on any page invalidates this Lease Contract. All notices and documents may be in English and, at our option, in any language that you read or speak. All provisions regarding our non-liability and non-duty apply to our employees, agents, and management companies. This Lease Contract is subordinate to existing and future recorded mortgages, unless the owner's lender chooses otherwise. All Lease Contract obligations must be performed in the county where the apartment is located.

    We may deactivate or not install keyless bolting devices on your doors if: (1) you or an occupant in the dwelling is over 55 or disabled, and (2) the requirements of Section 92.153(e) or (f), Texas Property Code are satisfied.

    Cable channels that are provided may be changed during the Lease Contract term if the change applies to all residents. Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, you must use only battery-operated lighting.

    Residents may have rights under Texas law to terminate the lease in certain situations involving family violence, sexual assault, or a military deployment or transfer.

34. **PAYMENTS.** Payment of all sums is an independent covenant. At our option and without notice, we may apply money received (other than sale proceeds under paragraph 13 or utility payments for gas, water or electricity) first to any of your unpaid obligations, then to current rent—regardless of notations on checks or money orders and regardless of when the obligations arose. All sums other than rent are due upon our demand. After the due date, we do not have to accept the rent or any other payments.

35. **TAA MEMBERSHIP.** We represent that, at the time of signing this Lease Contract: (1) we; (2) the management company that represents us; or (3) any locator service that procured you is a member in good standing of both the Texas Apartment Association and the affiliated local apartment association for the area where the apartment is located. The member is either an owner/management company member or an associate number doing business as a locator service (whose name and address must be disclosed on page 6). If not, the following applies: (1) this Lease Contract is voidable at your option and is unenforceable by us (except for property damages); and (2) we may not recover past or future rent or other charges. The above remedies also apply if both of the following occur: (1) the Lease Contract is automatically renewed on a month-to-month basis two or more times after membership in TAA and the local association has lapsed; and (2) neither the owner nor the management company is a member of TAA and the local association at the time of the third automatic renewal. A signed affidavit from the local affiliated apartment association which attests to non-membership when the Lease Contract or renewal was signed will be conclusive evidence of non-membership. Governmental entities may use TAA forms if TAA agrees in writing.

## Security Guidelines for Residents

36. **SECURITY GUIDELINES.** We care about your safety and that of other occupants and guests. No security system is failsafe. Even the best system can't prevent crime. Always act as if security systems don't exist since they are subject to malfunction, tampering, and human error. We disclaim any express or implied warranties of security. The best safety measures are the ones you perform as a matter of common sense and habit.

    Inform all other occupants in your apartment, including any children you may have, about these guidelines. We recommend that all residents and occupants use common sense and follow crime prevention tips, such as those listed below:

    * In case of emergency, call 911. Always report emergencies to authorities first and then contact the management.
    * Report any suspicious activity to the police first, and then follow up with a written notice to us.
    * Know your neighbors. Watching out for each other is one of the best defenses against crime.
    * Always be aware of your surroundings and avoid areas that are not well-traveled or well-lit.
    * Keep your keys handy at all times when walking to your car or home.
    * Do not go inside if you arrive home and find your door open. Call the police from another location and ask them to meet you before entering.
    * Make sure door locks, window latches and sliding glass doors are properly secured at all times.
    * Use the keyless deadbolt in your apartment when you are at home.
    * Don't put your name or address on your key ring or hide extra keys in obvious places, like under a flower pot. If you lose a key or have concerns about key safety, we will rekey your locks at your expense, in accordance with paragraph 9 of the Lease Contract.

    * Check the door viewer before answering the door. Don't open the door if you don't know the person or have any doubts. Children who are old enough to take care of themselves should never let anyone inside when home without an adult.
    * Regularly check your security devices and smoke and other detectors to make sure they are working properly. Detection device batteries should be tested monthly and replaced at least twice a year.
    * Immediately report in writing (dated and signed) to us any needed repairs of security devices, doors, windows, smoke and other detectors, as well as any other malfunctioning safety devices on the property, such as broken access gates, burned out exterior lights, etc.
    * If your doors or windows are not secure due to a malfunction or break-in, stay with a friend or neighbor until the problem is fixed.
    * When you leave home, make sure someone knows where you're going and when you plan to be back.
    * Lock your doors and leave a radio or TV playing softly while you're gone. Close curtains, blinds and window shades at night.
    * While gone for an extended period, secure your home and use lamp timers. Also stop all deliveries (such as newspaper and mail) or have these items picked up daily by a friend.
    * Know at least two exit routes from your home, if possible.
    * Don't give entry keys, codes or gate access cards to anyone.
    * Always lock the doors on your car, even while driving. Take the keys and remove or hide any valuables. Park your vehicle in a well-lit area.
    * Check the backseat before getting into your car. Be careful stopping at gas stations or automatic-teller machines at night—or anytime when you suspect danger.

    There are many other crime prevention tips readily available from police departments and others.

## When Moving Out

37. **MOVE-OUT NOTICE.** Before moving out, you must give our representative advance written move-out notice as provided below. Your move-out notice will not release you from liability for the full term of the Lease Contract or renewal term. You will still be liable for the entire Lease Contract term if you move out early (paragraph 22) except under paragraphs 10, 16, 22, 23 or 31. YOUR MOVE-OUT NOTICE MUST COMPLY WITH EACH OF THE FOLLOWING:

    * We must receive advance written notice of your move-out date. The advance notice must be at least the number of days of notice required in paragraph 3 or in special provisions—even if the Lease Contract has become a month-to-month lease. If a move-out notice is received on the first, it will suffice for move-out on the last day of the month of intended move-out, provided that all other requirements below are met.
    * The move-out date in your notice (check one): ☐ must be the last day of the month; or ☐ may be the exact day designated in your notice. If neither is checked, the second applies.

    * Your move-out notice must be in writing. Oral move-out notice will not be accepted and will not terminate your Lease Contract.
    * Your move-out notice must not terminate the Lease Contract sooner than the end of the Lease Contract term or renewal period.
    * If we require you to give us more than 30 days written notice to move-out before the end of the lease term, we will give you a written reminder not less than 5 days nor more than 90 days before your deadline for giving us your written move-out. If we fail to provide a reminder notice, 30 days written notice to move-out is required.

    YOUR NOTICE IS NOT ACCEPTABLE IF IT DOES NOT COMPLY WITH ALL OF THE ABOVE. We recommend you use our written move-out form to ensure you provide the information needed. You must obtain from us written acknowledgment that we received your move-out notice. If we terminate the Lease Contract, we must give you the same advance notice—unless you are in default.

Apartment Lease Contract © 2009, Texas Apartment Association, Inc.   B2

38. **MOVE-OUT PROCEDURES.** The move-out date can't be changed unless we and you both agree in writing. You won't move out before the Lease Contract term or renewal period ends unless all rent for the entire Lease Contract term or renewal period is paid in full. Early move-out may result in reletting charges and acceleration of future rent under paragraphs 11 and 32. You're prohibited by law from applying any security deposit to rent. You won't stay beyond the date you are supposed to move out. All residents, guests, and occupants must surrender or abandon the apartment before the 30-day period for deposit refund begins. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address.

39. **CLEANING.** You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges—including charges for cleaning carpets, draperies, furniture, walls, etc. that are soiled beyond normal wear (that is, wear or soiling that occurs without negligence, carelessness, accident, or abuse).

40. **MOVE-OUT INSPECTION.** You should meet with our representative for a move-out inspection. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final refunding or accounting.

41. **SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES.** You'll be liable for the following charges, if applicable: unpaid rent; unpaid utilities; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse, including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the apartment and is missing; replacing dead or missing detection device batteries at any time; utilities for repairs or cleaning; trips to let in company representatives to remove your telephone or TV cable services or rental items (if you so request or have moved out); trips to open the apartment when you or any guest or occupant is missing a key; unreturned keys; missing or burned-out light bulbs; removing or rekeying unauthorized security devices or alarm systems; agreed reletting charges; packing, removing, or storing property removed or stored under paragraph 13; removing or booting illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false security-alarm charges unless due to ...; negligence; animal-related charges under paragraphs 6 and 27; government fees or fines against us for violation (by you, your occupants, or guests) of local ordinances relating to detection devices, false alarms, recycling, or other matters; late-payment and returned-check charges; a charge (not to exceed $100) for our time and inconvenience in our lawful removal of an animal or in any valid eviction proceeding against you, plus attorney's fees, court costs, and filing fees actually paid; and other sums due under this Lease Contract.

You'll be liable to us for: (1) charges for replacing all keys and access devices referenced in paragraph 5 if you fail to return them on or before your actual move-out date; (2) accelerated rent if you have violated paragraph 32; and (3) a reletting fee if you have violated paragraph 11.

42. **DEPOSIT RETURN, SURRENDER, AND ABANDONMENT.** We'll mail you your security deposit refund (less lawful deductions) and an itemized accounting of any deductions no later than 30 days after surrender or abandonment, unless statutes provide otherwise.

You have *surrendered* the apartment when: (1) the move-out date has passed and no one is living in the apartment in our reasonable judgment; or (2) all apartment keys and access devices listed in paragraph 5 have been turned in where rent is paid—whichever date occurs first.

You have *abandoned* the apartment when all of the following have occurred: (1) everyone appears to have moved out in our reasonable judgment; (2) clothes, furniture, and personal belongings have been substantially removed in our reasonable judgment; (3) you've been in default for non-payment of rent for 5 consecutive days, or water, gas, or electric service for the apartment not connected in our name has been terminated or transferred; and (4) you've not responded for 2 days to our notice left on the inside of the main entry door, stating that we consider the apartment abandoned. An apartment is also "abandoned" 10 days after the death of a sole resident.

Surrender, abandonment, or judicial eviction ends your right of possession for all purposes and gives us the immediate right to clean up, make repairs in, and relet the apartment; determine any security deposit deductions; and remove property left in the apartment. Surrender, abandonment, and judicial eviction affect your rights to property left in the apartment (paragraph 13), but do not affect our mitigation obligations (paragraph 32).

43. **ORIGINALS AND ATTACHMENTS.** This Lease Contract has been executed in multiple originals, each with original signatures—one for you and one or more for us. Our rules and community policies, if any, will be attached to the Lease Contract and given to you at signing. When an Inventory and Condition form is completed, both you and we should retain a copy. The items checked below are attached to this Lease Contract and are binding even if not initialed or signed.

☐ Access Gate Addendum
☐ Additional Special Provisions
☐ Animal Addendum
☐ Apartment Rules or Community Policies
☒ Asbestos Addendum (if asbestos is present)
☐ Early Termination Addendum
☐ Enclosed Garage, Carport or Storage Unit Addendum
☒ Inventory & Condition Form
☐ Intrusion Alarm Addendum
☐ Lead Hazard Information and Disclosure Addendum
☐ Lease Contract Guaranty (_____ guaranties, if more than one)
☐ Legal Description of Apartment (if rental term longer than one year)
☐ Military SCRA Addendum
☒ Mold Information and Prevention Addendum
☐ Move-Out Cleaning Instructions
☐ Notice of Intent to Move Out Form
☐ Parking Permit or Sticker (quantity:_____)
☐ Rent Concession Addendum
☐ Renter's or Liability Insurance Addendum
☐ Repair or Service Request Form
☐ Satellite Dish or Antenna Addendum
☐ TCEQ Tenant Guide to Water Allocation
☐ Utility Allocation Addendum for: ☐ electricity ☐ water ☐ gas ☐ central system costs ☐ trash removal ☐ cable TV
☐ Utility Submetering Addendum for: ☐ electricity ☐ water ☐ gas
☐ Other _____
☐ Other _____

Name, address and telephone number of locator service (if applicable—must be completed to verify TAA membership under paragraph 35):

_____

> You are legally bound by this document. Please read it carefully.
>
> Before submitting a rental application or signing a Lease Contract, you may take a copy of these documents to review and/or consult an attorney.
>
> Additional provisions or changes may be made in the Lease Contract if agreed to in writing by all parties.
>
> You are entitled to receive an original of this Lease Contract after it is fully signed. Keep it in a safe place.

Resident or Residents (all sign below)

_____  1/3/10

_____ Date signed

_____ Date signed

_____ Date signed

Owner or Owner's Representative (signing on behalf of owner)

*Bonnie Smith*

Address and phone number of owner's representation for notice purposes

410 South Texas Avenue

College Station, TX 77840

979-846-4242

After-hours phone number: 979-846-4242

(Always call 911 for police, fire or medical emergencies.)

Date form is filled out (same as on top of page 1) 12-22-09

APARTMENT LEASE CONTRACT    TAA Official Statewide Form 09-A/B-1/B-2; Revised October, 2009; Copyright 2009, Texas Apartment Association

**Exhibit "E"**

Current Site Plan (Attached)



EXHIBIT "E"

# SCHEDULE 4(e)

| | | | |
|---|---|---|---|
| 85th Dist. Ct., Brazos County, TX 110-001870-CV-85 | Pltf: Pacific Mercantile Bank<br>Debtor Defs: Rossco Holdings, Inc.; Colony Lodging, Inc.<br>Non-debtor Co-Defendants: Lodgeco Properties, Ltd. | Suit to compel arbitration and appointment of receiver | Suggestion of Bankruptcy Filed (7/27/2010) |
| American Arbitration Association, Orange County, CA 773-148-Y-00255-10-GLO | Pltf: Pacific Mercantile Bank<br>Debtor Deffs: Rossco Holdings, Inc.; Monte Nido Estates, LLC; WM Properties, Ltd.; Colony Lodging, Inc.<br>Non-debtor Co-Defendants: Lodgeco, Inc.; Leonard M. Ross Revocable Trust; Leonard M. Ross; Monte Nido Homes, LLC; Rossco MP Properties Co., LLC | Commercial Arbitration Demand | Notice of Bankruptcy given to Manager of ADR Services, by letter dated August 11, 2010, from Steven D. Atlee, and by letter dated August 12, 2010, from Leonard M. Ross |